JACOB SINCOFF, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37956. Promulgated April 30, 1953.

*J. Henry Landman, Esq.*, for the petitioner.
*S. Jarvin Levison, Esq.*, for the respondent.

290

**OPINION.**

MURDOCK, *Judge:* The first contention of the petitioner is that its earnings were not accumulated beyond the reasonable needs of the business and it was not availed of during 1945 for the purpose of pre-

venting the imposition of the surtax on its stockholders within the meaning of section 102. It argues that it had two businesses, one, the paper, paperboard, and twine business, which was becoming less important, and the other, called the primary one, the securities business. The petitioner was not a mere holding or investment company during 1945 because it operated as a jobber in the paper business. One of the arguments advanced to justify its accumulated earnings is its large indebtedness in order to buy securities as a part of its distinct and separate securities business. If its sole business had been the purchase, sale, and retention of securities it would have been a mere holding or investment company within the meaning of section 102 (b). Investment of surplus funds of a closely owned business instead of distributing them is one way of avoiding surtax on the stockholders. Obviously, the petitioner can not plead an investment business, distinct from its paper, paperboard, and twine business, as an excuse for the accumulation of any of its earnings in order to avoid the application of section 102. Therefore, the only business needs which may properly be considered are the needs of the paper, paperboard, and twine business.

Sincoff's testimony indicates that his reason for not declaring a cash dividend in 1945, and his only justification relating to the paper business for the accumulation of the 1945 earnings, was that prognostications in trade papers and other publications of a business slump to follow the close of World War II convinced him that no dividend should be paid because all available funds would be needed to survive the slump. No attempt was made to show the amount of capital actually used or needed in the paper, paperboard, and twine business or what the future needs of that business, which could be reasonably anticipated, were. Most of the goods purchased were shipped directly by the manufacturer to the customer under terms which permitted the petitioner to collect from its customers before it had to pay the manufacturers. Little was invested in plant, equipment, and inventories. Rents were extremely small and the principal expenses of the business were the salaries of the Sincoffs. The funds available in the business at the beginning of the year were more than ample to take care of the accounts receivable and payable in addition to all of the other needs of the business, present or reasonably forseeable in the future, shown by the record. A depression in the business would mean that even less would be required to operate the paper, paperboard, and twine business of the petitioner. Counsel for the petitioner mentions a number of threats to the business, some of which are not supported by the evidence, but, in any event, there has been no showing that funds in addition to those available at the beginning of 1945 were held to meet such threats or were reasonably necessary for any

such purpose. The evidence as a whole clearly indicates that no expansion in the business was contemplated at the close of 1945.

The purchase of the Government obligations and the incurring of the indebtedness incident thereto was in no way necessary to the paperboard and twine business, despite statements that the paper manufacturers were interested in bond drives. The principal reason advanced for the purchase of the Government obligations was to make money in the security business apart from the paper, paperboard, and twine business. Those purchases and debts in no way benefited the latter business. Cf. *Whitney Chain & Mfg. Co.*, 3 T. C. 1109, affd. 149 F. 2d 936. Cases in which funds were accumulated to discharge debts incurred in the regular business or in which funds reasonably needed in that business were temporarily invested in securities are not helpful to the petitioner. The evidence as a whole supports the determination of the Commissioner and fails to show that the accumulated earnings of 1945 were reasonably needed in any way in the future operation of the business of the petitioner.

The remaining issue for decision is whether the Commissioner erred in determining the excess profits credit based upon invested capital by failing to include 50 per cent of the alleged borrowed capital for the reason that the indebtedness on which the petitioner relies does not meet the requirements of section 719 (a) (1) of the Internal Revenue Code and section 35.719–1 of Regulations 112. The record is somewhat vague as to just what amounts the petitioner is contending qualify as indebtedness under section 719 (a) (1). Its argument is that it borrowed money from brokers in order to purchase Government securities and the amount due to the brokers in that connection qualifies as indebtedness under section 719 (a) (1). The petitioner had an account during 1945 with the brokerage firm of Eisele & King, Libaire, Stout & Co. The exhibits include two cards which the petitioner signed in connection with that account for later years and it might be fairly inferred from the record that somewhat similar cards had been signed as early as 1945. The record does not show what transactions the petitioner had with that particular brokerage firm in 1945, that the Government obligations were bought from it, or the extent, if any, to which the amount "due to brokers for purchase of Government securities" was owed to that particular brokerage firm. The petitioner purchased some Government securities during 1945 and owed amounts shown in the record to brokers in connection with those purchases. The record does not show the details of the purchases or the arrangement between the petitioner and its brokers under which the debts were incurred. If it may be assumed for the purpose of discussion that the amounts were all borrowed from the Eisele firm and the cards are explanatory of the relationship, and certainly no

assumption more favorable to the petitioner is justified by the record, even so, the determination of the Commissioner must be upheld. The petitioner in such a case would appear to have a running account with a broker, the debit balance in which would vary from time to time, there would be no date for payment of any particular amount, and the case would be controlled by the decision in *Pacific Affiliate, Inc.*, 18 T. C. 1175, in which case at page 1205 this Court said:

In the instant proceeding the basic agreement, as witnessed by the documents in evidence, pursuant to which the petitioner's margin account was established and maintained, was of the sort commonly found in the investment brokerage business. As we read it, it did nothing more than establish a certain line of credit to petitioner for the purchase in the financial market of securities which were to be held as collateral against default in payment of the full purchase price. There was no actual assignment of specific securities to secure the repayment of any fixed sum to be advanced. In fact, the record discloses no advance of moneys actually received by petitioner. We cannot say that the instruments involved legally constituted a mortgage within the meaning of section 719, *supra*. Cf. *Consolidated Goldacres Co.* v. *Commissioner*, 165 F. 2d 542, affirming 8 T. C. 87, certiorari denied 334 U. S. 820; *Bernard Realty Co.* v. *United States*, 188 F. 2d 861; *Pendleton & Arto, Inc.*, 8 T. C. 1302.

See also *Parshall* v. *Eggert*, 54 N. Y. 18; *Utica Trust & Deposit Co.* v. *Decker*, 244 N. Y. 340, 120 N. E. 692; *Peter Barrett Mfg. Co.* v. *Wheeler*, 212 N. Y. 90, 105 N. E. 812, supporting the conclusion that a brokerage account such as this does not represent a mortgage. The petitioner has not shown that the amount of its outstanding indebtedness during 1945 was to any extent evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust within the meaning of section 719 (a) (1).

*Decision will be entered for the respondent.*