Kerr-Cochran, Incorporated, a Nebraska Corporation v. Commissioner.
Kerr-Cochran, Inc. v. Commissioner
Docket No. 48271.
United States Tax Court
T.C. Memo 1955-90; 1955 Tax Ct. Memo LEXIS 249; 14 T.C.M. (CCH) 304; T.C.M. (RIA) 55090; April 15, 1955
*249 Petitioner was principally engaged in buying, selling and renting automobiles, trucks, farm machinery, automotive parts, and equipment. In addition, it invested funds in commercial real estate, stocks, oil leases, and made loans to its president and his relatives. The president of the company owned over 97 per cent of the company's stock. During 1949 and 1950, petitioner had substantial earned surplus and net income after taxes, but no dividends were paid to stockholders.
1. Held, on the facts, that earnings or profits were permitted to accumulate during 1949 and 1950 beyond the reasonable needs of the business within the meaning of section 102(c), Internal Revenue Code, 1939. 2. Held further, that petitioner was availed of during the years in question for the purpose of avoiding surtax upon its shareholders within the meaning of section 102, Internal Revenue Code, 1939. James D. Conway, Esq., for the petitioner. Richard C. McLaughlin, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for 1949 and 1950 of $35,621.01 and $25,727.93, respectively. The only issue involved herein is whether petitioner *250 was availed of during the years in question for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. Findings of Fact Some of the facts were stipulated. Those so stipulated are found accordingly and incorporated herein by reference. Petitioner is a corporation which was organized under the laws of the State of Nebraska on August 10, 1939, with its principal place of business in Hastings, Nebraska. Petitioner's income tax returns for the calendar years 1949 and 1950 were filed with the then collector of internal revenue for the district of Nebraska. Since its incorporation, petitioner has employed a calendar year and accrual method of accounting and its tax returns have been prepared and filed on that basis. The Articles of Incorporation of the company provide in part that its objects and purposes are to manufacture, buy and sell motor vehicles, merchandise relating to the automotive industry, and other merchandise; and to maintain a shop for the repair of motors. It also provides that, among other powers, the corporation has the right to acquire and dispose *251 of personal and real property as may be necessary or convenient for the proper conduct of the affairs of the corporation. Petitioner was organized by Claren R. Kerr, Hastings, Nebraska, H. Max Cochran, Creston, Iowa, and Homer N. Harsh, Creston, Iowa. Authorized capital stock was two hundred and fifty (250) shares of common stock with a par value of One Hundred Dollars ($100.00). Two hundred (200) shares were issued on September 2, 1939, to the following persons and in the following amounts: Shares
Claren Kerr, Hastings, Nebraska
72
H. Max Cochran, Creston, Iowa
72
Andrew J. Harsh, Hastings, Nebraska
20
Harry Blosser, Creston, Iowa
16
Homer Harsh, Creston, Iowa
20
200 A total amount of $25,000 was paid in at this time which was credited to the capital accounts, as follows: Capital Stock (Common)
$20,000
Paid-in or Capital Surplus
5,000
The corporation had a nonexclusive franchise confined to the Hastings, Nebraska, area for the sale of Chevrolet automobiles. It was also authorized to sell Chevrolet trucks on a fleet basis (five or more) anywhere in the United States. In addition to these activities, the company engaged in numerous other activities including the sale of farm machinery, hydraulic hoists *252 and truck bodies, the rental of trucks to the United States through contractors, the raising of wheat in a joint venture, and the financing of some of its sales. On August 30, 1946, the stockholders of petitioner voted to retire 127 shares of its common stock at the then book value of $281.28 per share. On or about the same date, Claren Kerr sold one share of common stock to his brother, Lyle Kerr. Thereafter, the stockholders of record were as follows: Shares
Claren Kerr
71
Lyle Kerr
1
Andrew J. Harsh
1 These three individuals were elected directors at a stockholders meeting held on August 30, 1946, and have continued to act in that capacity. Also on August 30, 1946, Claren Kerr was elected President, Lyle Kerr, Vice-President, and Andrew J. Harsh, Secretary-Treasurer. They have continued to hold their respective offices to the date of the hearing herein. At a special stockholders meeting held on December 20, 1947, the shareholders authorized the directors of the corporation to issue to the stockholders of record on that date two shares of common stock for each share outstanding. From that date to the date of hearing, the capital stock of the petitioner has been held as follows: Shares
Claren Kerr
213
Lyle Kerr
3
Andrew J. Harsh
3
Total
219
Petitioner's *253 gross income, net income, and net income after taxes as reported on its tax returns for each of the years 1946-1951, inclusive, were as follows: Gross
Net
Net Income
Year
Income
Income
After Taxes
1946
$102,496.78
$ 54,192.55
$ 33,599.38
1947
341,377.89
171,787.59
106,652.46
1948
338,735.72
180,164.70
111,702.11
1949
361,436.36
195,312.17
121,093.54
1950
350,245.58
149,388.88
91,633.04
1951
425,142.87
166,140.81
77,924.84
Petitioner's earned surplus and undivided profits, and the ratio of current assets to current liabilities, as of December 31 of each of the years 1946-1951, inclusive, were as follows: Earned Surplus
Ratio of Current
and Undivided
Assets to Current
Year
Profits
Liabilities
1946
$ 44,569.40
1.206
1947
136,621.86
2,580
1948
248,323.97
3,585
1949
369,417.51
4,313
1950
460,850.55
4,203
1951
544,985.37
3,577
Petitioner's balance sheets as of December 31, 1949 and December 31, 1950 were as follows: ASSETS
1949
1950
Cash
$152,272.35
$121,991.87
Notes and Accounts Re-
ceivable (Less Reserve
for bad debts)
156,013.04
144,468.27
Inventory (Finished
goods)
90,234.18
149,981.35
Other Investments (Se-
curities)
40,102.20
45,338.21
Building under construc-
tion
59,193.99
Building
50,000.00
50,000.00
Service and Company
cars
$ 2,146.32
$ 7,779.74
Machinery and Equipm't
10,385.61
10,385.61
Furniture and Fixtures
2,270.14
2,270.14
Land
20,000.00
21,906.41
Prepaid insurance, ad-
vertising deposits
2,843.66
2,911.32
Leasehold improvements
3,559.78
8,729.08
Total - Before Reserve
for Depreciation
$529,827.28
$624,955.99
Less Reserve for De-
preciation on Depre-
ciable Assets
12,679.45
16,780.96
Total Assets
$517,147.83
$608,175.03
LIABILITIES
Accounts Payable
$ 23,457.36
$ 39,084.10
Accrued Taxes
2,434.42
10,212.91
Accrued Wages
1,000.00
Provision for Federal
Income Taxes
74,218.63
57,955.84
Surplus Reserves
23,894.91
15,346.63
Capital Stock
21,900.00
21,900.00
Paid-in or Capital Sur-
plus
1,825.00
1,825.00
Earned Surplus and Un-
divided Profits
369,417.51
460,850.55
Total Liabilities
$517,147.83
$608,175.03
*254 In 1948, petitioner entered into a joint venture with A. L. Lintner of Tucson, Arizona, and the Pioneer Automobile Company of Denver, Colorado, for the sale of parts to the Chinese Nationalist Government. The American National Bank of Denver, Colorado, acted as the intermediary in this venture. To insure the joint venture's credit and to guarantee payment for the parts purchased, petitioner deposited $100,000 of its funds with the bank and Claren Kerr deposited $50,000 of his personal funds on behalf of the petitioner. This money was deposited on or about December 6, 1948, and remained on deposit with that bank during 1949 and 1950. Petitioner's profit on the parts transaction, which was completed in 1950, was about $60,000. Claren Kerr did not directly receive any profit from the transaction. On June 24, 1949, petitioner purchased a commercial building in Grand Island, Nebraska, at a total cost of $70,000. This building was held by the petitioner as rental property during the years 1949 and 1950. During 1950 petitioner's officers and several other merchants in Hastings, Nebraska, discussed the possibility of building a warehouse for their individual uses and for rental to other people. *255 Prior to beginning construction, the other interested parties were financially unable to continue with this venture and petitioner then proceeded on its own to build the Hastings warehouse. The building was completed in June 1951, at a cost of $146,404.23 of which $59,193.99 was expended during 1950. Subsequent to the completion of the warehouse in 1951, it was leased to the Federal Government for the storage of crude rubber and to a truck operator for use as a truck terminal. Donald Johnson is Claren Kerr's brother-in-law. During 1951, Donald Johnson and Lyle Kerr, vice-president of petitioner, entered the automobile business in Auburn, Nebraska. Petitioner loaned Donald Johnson, without interest, $30,000 on or about January 26, 1951, and an additional $4,000 on or about March 6, 1951, for the purpose of enabling Donald Johnson to purchase the Chevrolet business at Auburn, Nebraska. During 1951, Donald Johnson made payments in the total amount of $4,070.25 to be applied against this loan and a prior indebtedness. The balance in this account, which was carried on petitioner's books as an account receivable, as of December 31, 1951, was $37,429.75. During January 1951, petitioner purchased *256 a garage building in Auburn, Nebraska, at a cost of $34,500, which it then leased at a net rental of $250 per month to Donald Johnson. Petitioner also had invested some of its funds in securities and oil leases. Its total of such investments as of December 31 of each year is as follows: Total Oil and Security
Year
Investments
1948
$34,057.26
1949
34,157.26
1950
38,538.21
1951
36,248.21
Peter Kiewit Sons Company is engaged in the general contracting business, which includes building dams, airports, highways and office buildings. Petitioner sold Peter Kiewit Sons Company new trucks and bought some of their used trucks. The account of Peter Kiewit Sons Company, carried on petitioner's books as an account receivable, was paid promptly during the years 1949-1951, inclusive, and several times during 1949 and 1950 the account showed a credit balance. Beginning on or about April 10, 1951, petitioner began selling trucks installed with special equipment for operation in a cold climate to Peter Kiewit Sons Company. This account was carried on petitioner's books under the name of North Atlantic Constructors. The account of North Atlantic Constructors, which was financed by the petitioner, was paid promptly *257 during its existence, usually within two or three weeks after a charge was made to the account. In order to carry this account (which had a debit balance of $473,699.13 on April 26, 1951) and that of Peter Kiewit Sons Company, on April 25, 1951, petitioner borrowed $190,000 from The Hastings National Bank, Hastings, Nebraska, and the Omaha National Bank, Omaha, Nebraska. Claren Kerr personally guaranteed these loans. They were repaid shortly thereafter as follows: $100,000 on May 1, 1951, $50,000 on May 7, 1951, and $40,000 on May 14, 1951. Also during 1951, petitioner borrowed the following additional funds from sources other than Claren Kerr (discussed infra) and the banks: $25,000 from Leona Cochran on January 24, 1951; and $40,000 from Kerr-Cochran Sales Company on or about April 11, 1951. These amounts were repaid subsequently during 1951. At the time all the above loans were made, petitioner had exhausted its line of credit with normal lending institutions. Petitioner and Claren Kerr advanced funds to each other during each of the years 1949 through 1951. His account with the company fluctuated during 1949 between a credit balance of $3,305.77 and a debit balance of $19,149.91. *258 During 1950, it fluctuated between a debits balance of $1,208.02 and a credit balance of $9,244.49. During 1951, it fluctuated between a credit balance of $119,776.05 on April 17, 1951, and a debit balance of $15,678.48 on November 31, 1951. During the first four months of 1951, Claren Kerr advanced over $115,000 to the corporation which was entirely repaid by May 26, 1951. Of this amount, he had personally borrowed $40,000 on April 17, 1951, from the Hastings National Bank. During the years in question, Claren Kerr was paid a salary of $300 per month by petitioner. He was also entitled to a bonus of 15 per cent of the company's net profit before taxes each year but the bonus was waived for 1949. The total compensation paid to him by petitioner during 1949, 1950 and 1951, was $3,650, $28,650, and $32,180, respectively. Claren Kerr purchased a farm located near Lexington, Missouri, in 1946, on which he proceeded to develop apple orchards. From the date of his purchase he suffered large losses in the operation of the farm. Petitioner advanced money, without interest, for the operation of the farm during the years 1948-1951, inclusive. These advances were carried on petitioner's books *259 during the years 1948-1951, inclusive, as an account receivable. The following schedule shows the amounts advanced, amounts repaid, and balances in this account as of December 31 of each of the years 1948-1951, inclusive: Amount
December 31
Year
Advanced
Balance
1948
$ 2,096.21
$ 2,096.21
1949
3,500.00
5,596.21
1950
9,476.76
15,072.97
1951
12,934.00
28,006.97
During 1951, petitioner advanced $32,518.27, of which $2,620.66 was repaid during that year, to commence construction of a personal residence for Claren Kerr. The unpaid balance in this account receivable at the end of 1951 was $29,897.61. During 1951, petitioner advanced funds to Claren Kerr and R. J. McKenzie for the purpose of buying lots and erecting several houses. After construction these houses were to be sold and the profits divided equally between Claren Kerr and R. J. McKenzie. As of September 22, 1951, petitioner had advanced $28,009.27 for this purpose. Beginning on September 30, 1946, and continuing through 1950, petitioner advanced money to Gladys Kerr, wife of Claren Kerr. These advances were carried on petitioner's books as an account receivable. No interest was paid on any of these advances. The following schedule reflects the *260 total amounts advanced and repaid in each of the years 1946-1951, inclusive, and the balance in the account as of December 31 of each year: Amount
Amount
December 31
Year
Advanced
Repaid
Balance
1946
$15,000.00
$15,000.00
1947
25,739.32
$28,700.00
12,039.32
1948
12,039.32
1949
5,264.80
17,304.12
1950
15,000.00
32,304.12
1951
32,304.12
On December 31, 1951, Gladys Kerr repaid the entire balance due, and the account was reduced to zero. There had been no advances to her during 1951. During the years in question, petitioner had a line of credit up to $40,000 with The Hastings National Bank. This was the maximum amount that bank would loan to any one borrower. Petitioner was also able to borrow larger amounts from other banks upon Claren Kerr's guarantee. No cash dividends have ever been paid by petitioner. For each of the years 1949 and 1950, Claren Kerr reported net taxable income of $35,930.81 and $29,515.27, respectively, upon which he incurred income tax liability of $10,841.56 and $8,369.28, respectively. Had petitioner distributed as a dividend the entire amount of its net income after taxes in each year, Claren Kerr's liability for income tax would have been increased by $72,143.98 and $52,998.68, respectively. *261 During each of the years 1949 and 1950, petitioner's earnings or profits were permitted to accumulate beyond the reasonable needs of its business, and the corporation was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. Opinion FISHER, Judge: Respondent determined that petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders during the taxable years 1949 and 1950, and that it is therefore subject to tax under section 102 of the Internal Revenue Code of 1939. He contends that the earnings or profits of the corporation were permitted to accumulate beyond the reasonable needs of the business during those years which is determinative of the purpose to avoid surtax upon shareholders within the meaning of section 102 unless "the corporation by the clear preponderance of the evidence shall prove to the contrary." Section 102(c), Internal Revenue Code, 1939. We have determined as ultimate findings of fact, supra, that there were such accumulations of earnings or profits and that petitioner was *262 availed of during the years in question for the prohibited purpose. In our analysis, we turn first to the question of whether earnings or profits were permitted to accumulate during the taxable years beyond the reasonable needs of the business within the meaning of section 102 (c). At the outset, it should be noted that the company's earned surplus and undivided profits rose from about $44,000 at the end of 1946 to over $460,000 at the end of 1950, and that during this entire period no dividends were paid to its stockholders. Petitioner's net income after taxes for 1949 and 1950, the years involved herein, was $121,093.54 and $91,633.04, respectively. The principal activities of the company were buying, selling, renting and repairing automotive vehicles (including trucks and farm machinery), parts, and equipment. In addition, however, the corporation engaged in activities which were not directly related to its automotive business. Such activities included investments in commercial real estate, corporate stocks, oil and gas leases, and loans to individuals. The recent case of Jacob Sincoff, Inc., 20 T.C. 288 (1953), affirmed 209 Fed. (2d) 569, involved a related factual situation. *263 In that case we said at page 292: "[Petitioner] argues that it had two businesses, one, the paper, paperboard, and twine business, which was becoming less important, and the other, called the primary one, the securities business. The petitioner was not a mere holding or investment company during 1945 because it operated as a jobber in the paper business. One of the arguments advanced to justify its accumulated earnings is its large indebtedness in order to buy securities as a part of its distinct and separate securities business. If its sole business had been the purchase, sale, and rention of securities it would have been a mere holding or investment company within the meaning of section 102(b). Investment of surplus funds of a closely owned business instead of distributing them is one way of avoiding surtax on the stockholders. Obviously, the petitioner can not plead an investment business, distinct from its paper, paperboard, and twine business, as an excuse for the accumulation of any of its earnings in order to avoid the application of section 102. Therefore, the only business needs which may properly be considered are the needs of the paper, paperboard, and twine business." In *264 the instant case, were petitioner a mere holding or investment company, that fact alone would be prima facie evidence of a purpose to avoid surtax upon shareholders. Section 102(b), Internal Revenue Code of 1939. Petitioner, however, is engaged principally in operating an automotive business. It is our view that the need for funds in the operating business, as distinguished from petitioner's investment activities, is the fundamental factor to be considered in determining the reasonableness of accumulated earnings and profits. In this respect, petitioner's use of funds for investments and certain other purposes (discussed infra) during the years in question indicates that its earnings or profits to this extent, at least, were not needed in its operating functions, and that such funds were therefore accumulated beyond its reasonable needs within the meaning of section 102(c). Helvering v. National Grocery Co. (1938) 304 U.S. 282, reversing 92 Fed. (2d) 931, reversing 35 B.T.A. 163; J. M. Perry & Co. v. Commissioner (C.A. 9, 1941), 120 Fed. (2d) 123, affirming a Memorandum Opinion of the Board of Tax Appeals; and Jacob Sincoff, Inc., supra. During 1949, petitioner expended $70,000 *265 for the acquisition of a commercial building in Grand Island, Nebraska, which it thereafter held as rental property. It also loaned over $5,000 to Gladys Kerr, the wife of its principal stockholder, and it advanced over $3,000 for the operation of a farm owned by Claren Kerr, the principal stockholder. Thus, during 1949, the company used about $80,000 for purposes not related to its normal business operations. Similarly during 1950, petitioner expended about $60,000 for the construction of a warehouse in Hastings, Nebraska, which was leased to others after its completion in 1951. It also increased its investment in securities and oil and gas leases by over $4,000, and it loaned an additional $15,000 to Gladys Kerr. Further advances of over $9,000 were made that year for the operation of Claren Kerr's farm. Thus, during 1950, over $88,000 was expended for purposes extraneous to the normal operations of petitioner's business. The year 1951 is not at issue herein but the use of funds in that year for purposes unrelated to the basic functions of the corporation gives some further indication, if any were needed, that the prior accumulation of earnings or profits was beyond the reasonable *266 needs of petitioner's operating business. During 1951, petitioner expended an additional $87,000 for the construction of the Hastings warehouse. It spent $34,500 for the acquisition of a garage building in Auburn, Nebraska, which it leased to Donald Johnson, Claren Kerr's brother-in-law. It also loaned Johnson $34,000 to enable him to purchase a Chevrolet business in Auburn, and over $28,000 was advanced to Claren Kerr and R. J. McKenzie who were partners in a home construction venture. In addition, over $32,000 was advanced to pay for the construction of a personal residence for Claren Kerr, and over $12,000 was advanced for the operation of his farm that year. Thus during 1951, petitioner expended over $225,000 for purposes alien to its normal business operations. Petitioner contends that accumulations of earnings or profits in 1949 and 1950 were necessary in order to increase the financial strength of the corporation. In this respect, however, it should be noted that petitioner's working capital position, as disclosed by its balance sheets, was most favorable at the end of each year involved herein despite large expenditures of cash for purposes unrelated to its operating business. *267 The ratio of current assets to current liabilities at the end of each of these years was well over four to one. Under these circumstances, it is apparent that the financial needs of petitioner were adequately provided for and that additions to working capital of the above-mentioned investment items (i.e., those which were not already reflected in working capital by reason of having been carried on the books as accounts receivable) would have resulted in the accumulation of quick assets far in excess of the reasonable demands of the business. See McCutchin Drilling Co. v. Commissioner (C.A. 5, 1944) 143 Fed. (2d) 480, affirming 45 B.T.A. 1146 [2 TCM 554]. Our view in this respect apparently concurs with that of the petitioner's officers who authorized the expenditures for investment purposes. Moreover, there is no evidence that such investments endangered the company's ability to meet current obligations as they might arise. On the contrary, the record discloses that, in addition to its working capital to meet its obligations, petitioner had the maximum allowable line of credit with The Hastings National Bank ($40,000), and additional sums could be borrowed by petitioner elsewhere *268 either from other banks upon Claren Kerr's guarantee or from Claren Kerr and other persons directly. We have noted that during 1949 and 1950 petitioner maintained intact a deposit of $100,000 with The American National Bank of Denver in Denver, Colorado, to guarantee payment for parts purchased by a joint venture in which petitioner participated for resale to the Chinese Nationalists. Despite the restriction on this large amount of cash, however, petitioner had other funds in sufficient quantity during those years to meet the needs of its current business operations and to use for the other purposes set out above. Accordingly, it is apparent that the Chinese transaction did not necessitate the accumulation of earnings or profits to any material extent. Petitioner also points out that $190,000 was borrowed from banks in addition to advances and other borrowings during 1951 to finance the accounts of North Atlantic Constructors and Peter Kiewit Sons Company. The bank loans were completely repaid, however, within three weeks, and large advances to petitioner by Claren Kerr were repaid within two months. These factors indicate that the need for funds was only temporary in nature. There *269 is no evidence that petitioner accumulated earnings or profits in 1949 or 1950 in anticipation of a need for funds to carry these two large accounts in 1951. Furthermore, the use of over $225,000 of corporate funds for other purposes during that year, as set out above, is inconsistent with petitioner's contention. Petitioner also contends that the accumulation of earnings or profits was necessary in order to augment the corporation's growth and expansion. It is our view, however, that the use of corporate funds in various enterprises of its principal stockholder and his relatives and in other investments during the years in question is manifestly incompatible with this contention. Moreover, there is no evidence of any plans or commitments for the expansion of petitioner's business operations which would require capital outlays commensurate with the accumulations during the years in question. Accordingly, for the reasons expressed above, it is our view that earnings or profits were permitted to accumulate during the years involved herein beyond the reasonable needs of petitioner's business within the meaning of section 102(c). Our finding that an unnecessary accumulation of earnings *270 or profits was permitted during the years in question is according to section 102(c), determinative of the further fact that the corporation was availed of for the purpose of avoiding surtax upon shareholders within the meaning of section 102 unless petitioner proves to the contrary by a clear preponderance of the evidence. We hold that petitioner has not met its burden of proof in this respect. Whitney Chain & Mfg. Co., 3 T.C. 1109 (1944), affirmed 149 Fed. (2d) 936. Moreover, we believe that the record affirmatively establishes that petitioner was availed of during the years in question for the prohibited purpose. After August 30, 1946, over 97 per cent of the petitioner's stock was owned by its president, Claren Kerr. His use of petitioner's corporate entity thereafter indicates clearly that he considered it much in the light of an incorporated pocketbook. The balance in his personal account with the company varied considerably during the years in question as the need for funds by himself or the corporation arose. Moreover, as set out fully above, large amounts were advanced by the corporation for the operation of his farm and for the construction of his personal residence. Similarly, *271 the corporation advanced funds for the use of his wife and for a home construction venture in which he was a partner. Furthermore, as already stated, the corporation invested funds in numerous enterprises which were not related to its operating business. Among such investments were securities, oil and gas leases, commercial real estate, and the automobile business of his brother-in-law. We think that these investments were made largely to satisfy the personal wishes of Claren Kerr rather than for corporate purposes. It appears clear from the record that, for all practical purposes, Claren Kerr used corporate funds as his own during the years in issue. Although no dividends were ever paid to him and he waived a substantial bonus due him in 1949, he received the equivalent of the corporate earnings to the extent that he wanted to make personal use of them during this period under other guises. See United Business Corporation v. Commissioner (C.A. 2, 1933), 62 Fed. (2d) 754, affirming 19 B.T.A. 809. The failure to pay dividends resulted in extensive savings of income taxes on Kerr's part for the years in question. For 1949 and 1950 he reported a net taxable income of $35,930.81 and *272 $29,515.27, respectively. Had his share of petitioner's net income after taxes been distributed to him in each of those years, his tax liability would have been increased by $72,143.98 and $52,998.68, respectively. Thus, by leaving the money in the corporation, Kerr was able to use the full amount, unreduced by personal income taxes, for investments and other activities unrelated to the normal activities of the business which inured to his own personal benefit as substantially the sole owner. In this way, his personal assets, as reflected in his equity in the corporation, increased in value each year without the increment having been subjected to personal income tax liability. This means of at least deferring the tax was without any material inconvenience to Kerr since he at all times had access to corporate funds for his personal use when and if needed through the medium of either salary, or loans. It should not be overlooked that much of the impact of progressive income tax rates on such undistributed corporate earnings might later be avoided by the subsequent sale of Kerr's corporate stock (in which event his gain would be taxed at capital gains rates), or by the subsequent gift *273 or bequest of the stock (in which event gift or estate tax rates would apply). Under the circumstances, we draw the affirmative inference that independent of the presumption created under section 102(c) by our finding that earnings and profits were permitted to accumulate beyond the reasonable needs of petitioner's business, the petitioner was availed of during the taxable years for the purpose of preventing the imposition of surtax upon its shareholders. Helvering v. National Grocery Co., supra. During the course of the hearing in the instant case, respondent offered testimony and documentary evidence concerning the years 1952 and 1953 which are subsequent to those in question. Petitioner objected to the introduction of these items and the objections were taken under advisement. We are of the opinion that such evidence should not be considered in relation to any of the issues before us, and we sustain petitioner's objections. No like objection was raised with respect to evidence of circumstances arising in 1951. Other adjustments determined by respondent have not been assigned as error in the instant case. Decision will be entered for the respondent. * *274 Footnotes
*. Before changed by an official order of the Tax Court dated June 6, 1955, this sentence read: "Decision will be entered under Rule 50."