Automotive Rebuilding Co., Inc. v. Commissioner.
Automotive Rebuilding Co. v. Commissioner
Docket Nos. 59872, 63462.
United States Tax Court
T.C. Memo 1958-197; 1958 Tax Ct. Memo LEXIS 21; 17 T.C.M. (CCH) 968; T.C.M. (RIA) 58197; November 28, 1958
Don O. Russell, Esq., 408 Olive Street, St. Louis 2, Mo., for the petitioner. Robert A. Roberts, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies in petitioner's income tax of $4,695.60 and $5,301.42 for the years ended June 30, 1952 and June 30, 1953, respectively. One of the issues to be decided is whether petitioner is subject to tax under section 102, I.R.C. 1939, as having been availed of during the taxable years to prevent the imposition of the surtax upon its *22 shareholders by permitting earnings or profits to accumulate beyond the reasonable needs of the business instead of being divided or distributed. The other issues raised by the pleadings are whether salaries paid by petitioner to its vice-president and to its secretary-treasurer during both taxable years are ordinary and necessary business expenses and deductible as such, and whether petitioner incurred deductible travel and promotion expenses during the year ended June 30, 1952 in excess of $3,220.95, the amount allowed by respondent. Findings of Fact Some of the facts were stipulated and are hereby so found. Petitioner, a corporation organized under the laws of Missouri on June 26, 1946 with its principal place of business in St. Louis, filed its return for the year ended June 30, 1952 with the collector of internal revenue for the first district of Missouri, and filed its return for the year ended June 30, 1953 with the district director of internal revenue at St. Louis, Missouri. These returns were filed on an accrual method of accounting. Respondent sent notifications to petitioner, pursuant to section 534, I.R.C. 1954, as amended, informing it that *23 the notices of deficiency for the years in issue set forth amounts with respect to section 102, I.R.C. 1939. Petitioner made timely replies to these notices. Petitioner was formed by Adolph and Imogene Burger, husband and wife, for the purpose of rebuilding automobile and truck engines and other automotive parts. This was its principal business activity during the taxable years in issue. Its charter provided for a broader range of activities. Petitioner is the successor organization to an automotive engine rebuilding business previously operated as a partnership by the Burgers. Petitioner's original capital totaled approximately $304,000, which consisted of the inventories and fixed assets of the partnership, plus $1,000 in cash. No additional capital has been contributed. Petitioner's issued and outstanding capital stock consists of 30,512 shares. The stock is held as follows: Adolph, 50 per cent; Imogene, 49.997 per cent; and their daughter, Nancy Gene Burger Callison,.003 per cent. The ownership of the issued stock has remained unchanged since the date of incorporation, except for the qualifying shares held by Nancy, which shares were originally issued to John Haring. Adolph *24 has served as president of petitioner since the date of incorporation. Petitioner's board of directors, from 1946 to May 1952, was composed of Adolph, Imogene and Haring. Nancy replaced Haring as vice-president and as a director in May 1952. Petitioner conducted its business by purchasing engines from stock dealers, or by receiving a used engine in exchange for a rebuilt one. The used engines were torn down and rebuilt and the usable parts were reconditioned. In 1946 through 1949, petitioner's principal customers were Montgomery Ward, Western Auto Supplies, Spiegel Stores, Gamble Stores, and like chain stores over the country, together with Ford dealers in the immediate area. In the beginning petitioner produced and delivered a substantial amount of merchandise and made a substantial profit. Inventories were built up and sales increased. Early in 1949, automobile manufacturers started speeding up production. The inventories of the chain stores started accumulating and they stopped buying large quantities from petitioner. This loss of business and the absence of a market for the specialized engines and parts resulted in a chargeoff for obsolescence of inventories during the years *25 ended June 30, 1949 and June 30, 1950 of $222,731.36 and $22,336.38, respectively. The effect of the manufacture of new automobiles on petitioner's business became more pronounced in 1950 and 1951. The minutes of the annual meeting of petitioner's stockholders held on July 5, 1949 provide in part: "The President stated that in his opinion the profit in the motor rebuilding business in the future would gradually decline, as the production of new cars was increasing rapidly and it would be necessary for this Corporation to seek other means to increase earnings. He suggested, as a means of increasing earnings, the investing of corporate money in the television film production field and/or the outright purchase of television films, that the television industry was in its infancy and would doubtless become a major business in the near future and that television films would be in great demand. "He also suggested, as a means of increasing earnings, the investing of Corporation funds in the commodities market or other securities and the loaning of money to corporations, partnerships or individuals, or to enter into other business enterprises or ventures as a means to produce additional *26 earnings for the Corporation. The President stated that in order to enter into any of these fields of investment effectively, it would require the accumulation of substantial sums of money. After due discussion and upon motion duly made and seconded, it was unanimously: "RESOLVED, that the Company retain and accumulate from its net earnings sums of money for investment by the Company, at the President's discretion, at such times and in such amounts as the President shall deem proper, in the television film production and/or purchase of television films, in the commodities markets and/or securities, to loan money to corporations, partnerships or individuals and to enter into other business enterprises or ventures." Pursuant to this resolution, petitioner investigated and decided against the possibility of purchasing heavy oil equipment to lease. During the years 1946 through 1953, Adolph and Imogene owned and operated oil wells and oil-drilling equipment. Their investment in drilling equipment at the close of calendar year 1953 totaled $136,186.65. In July 1949, Adolph and Imogene made a trip to the west coast to investigate the television production business, studios, production, *27 equipment required and costs, as well as the production of such shows as "Lassie," "Wyatt Earp" and others. These shows exceeded petitioner's production facilities and means of financing. In 1950, petitioner investigated the possibility of the production of over-the-road trailers for trucks and large van-type bodies for trucks. In considering the feasibility of manufacturing metal trucks and trailer bodies, petitioner found the cost involved buying brakes and large heavy equipment, and that the over-all cost of going into such business would be about $1,600,000. It also investigated the possibility of manufacturing refrigeration units for over-the-road trailers and refrigerator trucks, used by ice cream companies, packing plants and perishable goods people. The company manufacturing such refrigeration considered by petitioner was controlled by the Eldon Manufacturing Company. The cost of this plant exceeded $1 million. Petitioner also investigated the metal stamping business which required presses of 100 to 150 tons to press desks, and items such as radiators and large panels for vending machines. In 1952, petitioner examined the possibility of acquiring the Lehman Lathe Company, *28 and found the cost to be $816,000. Also in 1952, Adolph made a trip to Florida to examine the possibility of entering the motel business, or the rent-a-car business. In 1953 or 1954, petitioner also considered becoming distributor for Carrier Industrial Air-Conditioning, and found that it would require capital of $1,800,000 to enter this business. Since these businesses involved excessive amounts of money ranging from $1 million to $1,500,000, petitioner not only felt that it was not in a position to finance such enterprises, but felt that the businesses were too hazardous to warrant such investment. In 1952, petitioner made an offer, which was refused, to the Clearview-Products Manufacturing Company, producers of carburetor kits, of $231,000 for the materials on hand, materials processed and packaged, and the goodwill of the company. Had the offer been accepted, petitioner would have had an additional expenditure of between $300,000 and $400,000 for machinery and equipment. The following agreements were entered into with Video Pictures, Inc., hereafter called Video, in 1953: "AGREEMENT AND ASSIGNMENT "AGREEMENT made this 16th day of March, 1953 by and between A. C. Burger *29 (and any other individuals, firms or corporations, as principals, A. C. Burger may represent as agent herein, all hereinafter called 'A. C. Burger'), Video * * *, a California corporation, and Henry R. McCune. "WITNESSETH "WHEREAS, Video * * * desires to be advanced various sums of money from A. C. Burger and A. C. Burger is willing to advance various sums of money, at his discretion, to Video * * *, provided Video * * * and Henry R. McCune agree to all of the terms and conditions hereinafter set forth: "NOW THEREFORE, in consideration of the foregoing and of the mutual promises herein contained, it is agreed between the parties as follows: "1. A. C. Burger will, from time to time, at his discretion, advance various sums of money to Video * * *. "2. Video * * * has entered into, and will in the future enter into, agreements and contracts for the exhibition of films made and/or owned by Video * * *, and to be made and/or owned in the future by Video * * *. As security for all advances made at any time by A. C. Burger to it, Video * * * hereby sells, assigns, transfers and sets over to A. C. Burger all of such agreements and contracts and the exclusive right to collect all *30 revenues and receipts due or at any time to become due to Video * * * thereon, and A. C. Burger is expressly authorized to collect and receive all sums of money at any time due thereon. As further security for such advances, Video * * * hereby sells, assigns, transfers and sets over to A. C. Burger all of its right, title and interest in and to any and all negative films of shows, (some known as 'Hank McCune Show'), produced and hereafter to be produced by Video * * * of approximately thirty minutes each, and any feature shows produced by Video * * *. Video * * * will at its expense store all of said negative films continuously with Pathe Laboratories, Inc. or Consolidated Film Industries, a division of Republic Pictures Company, of Hollywood, California. "3. The assignment of all of said contracts and the pledge of all of the negative film above mentioned shall remain in full force so long as any sums of money whatsoever are due from Video * * * to A. C. Burger. In the event all sums are not paid immediately when demanded, A. C. Burger shall have the right to foreclose his pledge on the said films by selling the same at public or private sale, and he may become the purchaser thereof *31 himself if he desires. "4. A. C. Burger hereby appoints Video * * * as his agent to collect the said revenue and receipts of said agreements and contracts assigned to A. C. Burger, by Video * * * and promptly forward said revenue and receipts to A. C. Burger, 5200 Virginia Avenue, St. Louis, Missouri. "5. After all of the advances by A. C. Burger to Video * * * shall have been repaid by Video * * *, then all subsequent net earnings of Video * * * shall be divided between A. C. Burger and Video * * * on the basis of * * * 60% to A. C. Burger and * * * 40% to Video * * *. "6. This agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of all the parties hereto. "IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written. "AGREEMENT "THIS AGREEMENT made and entered into this 16th day of March, 1953, by and between A. C. BURGER, an individual, and * * * [petitioner], hereinafter called collectively First Parties, and VIDEO * * *, a California corporation, hereinafter called Second Party. "WITNESSETH "That: "Second Party is in the business of producing *32 television films and is at the present time in need of funds with which to continue its production and wishes to have First Parties advance funds to it on the terms and conditions hereinafter set forth; and "WHEREAS, First Parties are willing, from time to time, to advance funds to Second Party on such terms and condition; "NOW THEREFORE, for and in consideration of the foregoing and of the mutual covenants herein contained and expressed, it is agreed by and between the parties hereto as follows: - "1. First Parties will from time to time advance funds to Second Party subject to the terms and conditions of this Agreement. However, this Agreement shall create no obligation upon First Parties to advance any particular sums of money, or to advance sums of money at any particular time. "2. All sums of money advanced by First Parties to Second Party shall be advanced as between First Parties in such proportions as shall be mutually agreed upon from time to time. First Parties shall participate in repayments of advances and shall participate in the net earnings hereinafter referred to in the proportions that they have contributed. As the amounts of the sums advanced are repaid they *33 shall be applied first to the advances which were first made. That is to say, repayments of advances shall be on the 'first in-first out' theory. "3. Second Party will use all of its net earnings to repay to First Parties all sums of money advanced to it by First Parties. "4. Heretofore a written agreement denominated 'Agreement And Assignment' has been entered into by and between A. C. Burger (on behalf of himself and any other principals whom he may represent), Video * * * and Henry R. McCune. As used in said contract the term 'A. C. Burger' includes Burger and any other principals whom he may represent. * * * It is specifically understood and agreed that * * * [paragraph 2] of the said Agreement And Assignment and all other portions thereof are incorporated herein by reference, and the said A. C. Burger shall represent himself and * * * [petitioner] insofar as said Agreement And Assignment are concerned. "5. After all of the advances by A. C. Burger to Video * * * shall have been repaid by Video * * *, then all subsequent net earnings of Video * * * shall be divided between A. C. Burger and Video * * * on the basis of * * * 60% to A. C. Burger and * * * 40% to Video * *34 * *. "6. This Agreement shall continue so long as Second Party shall continue to do business. "7. The terms of this Agreement shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto. "IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written." This latter agreement was superseded by an agreement dated January 15, 1954, "between A. C. BURGER, an individual, * * * [petitioner], COMMUNITY MOTORS, INC. and A.B.C. MOTORS, INC., Missouri corporations, * * * collectively as First Parties, and VIDEO * * * as Second Party." It provided "that all sums advanced by A. C. Burger or * * * [petitioner] prior to * * * [January 15, 1954] shall be first repaid before any sums advanced under this Agreement are repaid, and * * * that in estimating the participation of the parties * * * in the net earnings * * * consideration shall be given A. C. Burger and * * * [petitioner] for the sums which were advanced by the two said entities." In all other material respects, the two "Agreements" are the same. Community Motors, Inc., and A.B.C. Motors, Inc., were wholly *35 owned by Adolph and Imogene during the years in issue. Petitioner advanced the sum of $381,500 to Video during the period from May 18, 1953 to January 11, 1955. A total of 54 films were produced, 22 of which were in color, and are presently being withheld from the market awaiting a larger potential of color sets or receivers in the field. Petitioner had a ratio of current assets to current liabilities at the close of the fiscal years 1947 through 1953 of 1.473, 4.374, 13.632, 14.308, 6.051, 20.542 and 5.698, respectively. Petitioner's balance sheets as shown by its books and records as of June 30, 1952 and June 30, 1953 reflected the following assets and liabilities: BALANCE SHEET
Year Ended 6-30-52
Year Ended 6-30-53
Cash
$236,155.53
$117,672.29
Notes and A/C Receivable
207,771.48
471,852.64
Inventory: Raw Material & Parts
$ 67,152.94
$ 19,816.36
Finished Stock
41,457.94
108,610.88
24,174.95
43,991.31
Investment in Govt. Obligations
50,000.00
110,000.00
Capital Assets
Machy. & Equipment
$103,361.99
$103,444.79
Furniture & Fixtures
16,306.31
17,359.79
Trucks
3,833.73
3,833.73
$123,502.03
$124,638.31
Less: Reserve for Depreciation
105,083.24
18,418.79
111,897.68
12,740.63
Leasehold Improvements
$133,746.34
$133,746.34
Less: Reserve for Amortization
85,291.02
48,455.32
97,554.41
36,191.93
Other Assets
Prepaid Expenses
$ 4,918.93
$ 7,209.83
Incorporation Expense
538.00
5,456.93
538.00
7,747.83
TOTAL ASSETS
$674,868.93
$800,196.63
Liabilities
Accounts Payable
$ 12,305.56
$ 9,073.26
Notes Payable
120,000.00
Accrued Expenses
$ 2,827.40
Insurance
$ 484.65
352.19
Salaries & Wages
3,000.00
3,998.00
Vacation Pay
577.51
Taxes - General
7,544.53
11,029.18
3,995.46
11,750.56
Other Expenses
Reserve - Income Tax
5,996.90
6,148.20
Capital Stock - Common
304,128.57
304,128.57
Earned Surplus
341,408.72
349,096.04
TOTAL LIABILITIES
$674,868.93
$800,196.63
*36 Petitioner's subsidiary notes receivable and notes payable ledgers as of June 30, 1952 and June 30, 1953 reflected the following balances: Notes Receivable
6/30/52
6/30/53
Tool Manufacturing Company
$ 75,000
$165,000
Adolph C. Burger
10,000
Imogene Burger
15,000
F. P. Murdock
2,500
Andy Burger Motors, Inc.
25,000
A.B.C. Motors, Inc.
20,000
Springfield Motors, Inc.
20,000
Video Pictures, Inc.
121,000
Burger Investments, Inc.
100,900
75,700
Totals
$175,900
$454,200
Notes Payable
6/30/52
6/30/53
Capital City Motors, Inc.
$ 50,000
Springfield Motors, Inc.
50,000
Nancy Gene Burger Callison
20,000
Totals
0
$120,000
Tool Manufacturing Company is a partnership composed of Adolph and Imogene. F. P. Murdock was petitioner's chief accounting officer. Adolph and Imogene held the outstanding capital stock of Andy Burger Motors, Inc., A.B.C. Motors, Inc., Springfield Motors, Inc., Video, Burger Investments, Inc., and Capital City Motors, Inc. Andy Burger Motors, Inc., was operated as a proprietorship by the Burgers during the calendar years 1951 and 1952. Imogene advanced $87,354.88 to Video during the period May 18, 1953 to *37 January 11, 1955. Petitioner's net profit or (loss) after taxes as reflected by its returns, cash dividends paid and earned surplus are as follows: Net Profit
Earned
or (Loss)
Dividends
Surplus
Year
After Taxes
Paid
at June 30
1947
$161,132.00
$156,996.12
1948
182,224.81
334,382.51
1949
(261,048.78)
172,484.20
1950
21,661.69
192,662.91
1951
15,539.64
* 333,680.98
1952
11,118.10
341,408.72
1953
10,368.13
349,096.04
1954
8,721.98
355,386.52
1955
24,592.84
377,348.26
1956
(17,121.97)
$19,832.80
343,595.42
1957
11,841.66
11,899.68
341,295.15
The net income reported on petitioner's returns for the years in issue was computed as follows: Year
Year
Ended
Ended
6/30/52
6/30/53
Gross Profit from Sales
$ 89,665.24
$71,793.49
Net Short-Term Capital
Gain
217.63
Net Long-Term Capital
Gain
129.08
Other Income or (Loss)
14,033.94
(6,135.96)
Interest Income
4,866.87
625.00
Rents
22,900.00
24,000.00
Total Income
$131,683.68
$90,411.61
Deductions
115,841.04
75,607.37
Net Income Reported
$ 15,842.64
$14,804.24
*38 Adolph and Imogene's joint individual income tax returns for the years 1951, 1952 and 1953 reflect net taxable income of $176,480.42, $212,347.73 and $68,918.89, respectively. They received salaries from petitioner as follows: Year
Adolph
Imogene
Total
1946
$ 9,000
$ 600
$ 9,600
1947
36,000
2,400
38,400
1948
36,000
2,400
38,400
1949
24,000
2,400
26,400
1950
12,000
2,400
14,400
1951
12,000
2,400
14,400
1952
9,000
2,400
11,400
1953
6,000
2,400
8,400 During the years 1946 through 1955, corporations wholly owned by Adolph and Imogene realized net profits after taxes in the total amount of $3,251,531.69. No dividends were paid by any of these corporations during the calendar years 1946 through 1955. In addition to the salary she received from petitioner, Imogene was also paid wages by other corporations in the years and amounts as follows: Calendar Year
Corporation
1951
1952
1953
A.B.C. Motors, Inc.
$1,200
$1,200
$1,200
Community Motors, Inc.
1,200
1,200
1,200
Capital City Motors, Inc.
1,200
1,200
1,200
Springfield Motors, Inc.
1,200
1,200
1,200
Burger Motors, Inc.
1,200
1,200
1,200
Andy Burger Motors, Inc.
1,200
*39 Adolph and Imogene paid interest as follows to petitioner for personal loans: Year Paid
Amount
1948
$ 586.67
1949
269.18
1950
324.64
1953
7,078.84
1954
1,271.11
As an officer and director of petitioner, Imogene conferred from time to time with Adolph respecting the direction of the business. She made decisions in its management when Adolph was out of town. She took care of the minutes and the corporate seal, executed documents, and otherwise took care of all items customarily taken care of by the secretary and treasurer of a corporation. Petitioner deducted $2,400 in each of the years in issue for compensation paid to Imogene. Petitioner's board of directors voted Imogene a monthly salary of $200 and $100 for the fiscal years 1952 and 1953, respectively. The minute book reflects only the formal minutes of the board of directors. There were other informal meetings of the directors concerning business problems, and if a decision would be reached, a formal meeting would be held to determine officially the action to be taken by the company. Petitioner's board of directors held three recorded meetings during the years in issue and there was one recorded *40 meeting of petitioner's stockholders during this period. Corporate business discussed at these meetings was limited to matters involving election of board members and officers, and providing for their compensation. Nancy performed the same functions as Haring when she replaced him and received the same salary of $100 per month. She attended the informal as well as the formal meetings of the board of directors, helped make the decisions of the corporation, and acted on behalf of the corporation as an officer in the absence of the president. Petitioner deducted on its returns for the fiscal years 1952 and 1953, $100 and $1,200, respectively, for salaries paid to Nancy. These amounts were paid pursuant to a resolution of petitioner's board of directors. A reasonable salary for the services performed by Nancy during the years in issue is $100 per month. A reasonable salary for Imogene's services is $2,400 for fiscal year 1952 and $1,200 for fiscal year 1953. Petitioner was availed of during the years in issue to prevent the imposition of the surtax upon its shareholders by permitting earnings or profits to accumulate beyond the reasonable needs of the business. Opinion Petitioner, *41 it is true, was not a "mere holding or investment company." Had it been, the case could be closed with a peremptory reference to section 102(b).[1]R. L. Blaffer & Co., 37 B.T.A. 851, affd. (C.A. 5) 103 Fed. (2d) 487, certiorari denied 308 U.S. 576. But the facts show that what forecloses this disposition is that petitioner was actively engaged during the tax years in a manufacturing business which accounted for a substantial portion of its gross income. Jacob Sincoff, Inc., 20 T.C. 288, 292, affd. (C.A. 2) 209 Fed. (2d) 569. Nevertheless, there is no suggestion that this activity called for additional capital. Quite the contrary, petitioner's assertion that its business was in a declining trend is the only ground advanced by it for the accumulations in controversy. Under the circumstances thus appearing we think the reference in the statute to the "needs of the business" *42 must refer to the regular business of the taxpayer - the actual business rather than mere inactive investment - in which it is then engaged (as contrasted with some other unrelated business not then carried on by it or at least immediately contemplated at the time the accumulations occur). Latchis Theatres of Keene, Inc., 19 T.C. 1054, affd. (C.A. 1) 214 Fed. (2d) 834; K O M A, Inc. v. Commissioner, (C.A. 10) 189 Fed. (2d) 390, affirming a Memorandum Opinion of this Court [8 TCM 1064]; McCutchin Drilling Co., (C.A. 5) 143 Fed. (2d) 480, affirming a Memorandum Opinion of this Court [2 TCM 554]. And, of course, even less permissible is the purpose to use the corporation's resources to finance other unconnected enterprises in which its stockholders happen to be involved. Egan, Inc. v. Commissioner, (C.A. 8) 236 Fed. (2d) 343, affirming T.C. Memo. 1955-17 [14 TCM 421]; Latchis Theatres of Keene, Inc., supra.
Applying these assumptions to the present facts, we find that the most that can be said to justify the petitioner's position is that it was investigating *43 the possibility of discovering, deciding upon, and then engaging in some totally different activity in which it might participate affirmatively not as a mere inactive investor, and which at the critical time was not only no better than a future hope but had not even been selected. This cannot suffice to avoid the impact of section 102. K O M A, Inc. v. Commissioner, supra.
To emphasize the indefiniteness of any actual need of any present accumulation in petitioner's only real business, the familiar pattern appears of unneeded funds loaned or advanced to its sole stockholders or ventures in which they primarily were interested in a way that only became appropriate because the stockholders themselves had not received any dividends and were permitted to look to petitioner as the source of their liquid resources. This has never been considered a legitimate need of the business, Latchis Theatres of Keene, Inc., supra, and has frequently been regarded as one indication of a purpose inconsistent with those permitted under section 102. Kerr-Cochran, Inc. v. Commissioner, (C.A. 8) 253 Fed. (2d) 121, affirming T.C. Memo. 1955-90 [14 TCM 304]; *44 Kerr-Cochran, Inc., 30 T.C. 69. Shortly before the end of the period here under review, petitioner through the medium of a contract made by Burger, its controlling stockholder, loaned a considerable sum to Video. Petitioner had no active part in that enterprise. See The Dixie, Inc., 31 T.C. - (November 19, 1958). It is not even clear that Burger had. All petitioner was called upon to do was to make advances which were to be repaid before the division of any profits. We do not understand petitioner to contend that this could be considered petitioner's "business." Certainly the mere loaning or investment of money with no participation in management or in losses beyond its invested principal cannot be considered a "business." Higgins v. Commissioner, 312 U.S. 212. Some other connection than a loan for which petitioner would be compensated by getting a share of the profits must be present to distinguish a "mere holding or investment" from the type of activity exempt from the operation of section 102. R. L. Blaffer & Co., supra; Rands, Inc., 34 B.T.A. 1094. But even if we assume petitioner had two businesses in 1953, of which one *45 was Video, no basis appears for concluding that it had insufficient uncommitted surplus to take care of any possible "needs" of that business. Burger himself and several of his enterprises were also included in the contract with Video. But even without knowing of their resources, we must recognize that petitioner still retained large uncommitted funds, and for all that appears was never asked or expected to lend more than it did. We find nothing in the record to satisfy us that there was any reason for petitioner to accumulate any funds in any year for the anticipated needs of any part of its actual business. Petitioner expressly disclaims [2] any reliance on the burden of proof provisions of section 534, but in any event, all the accumulations in question were beyond the business needs. Under the circumstances, the conclusion that petitioner's earnings were accumulated for the purposes described in section 102 is inescapable. Kerr-Cochran, Inc., supra. In this respect the deficiency is approved. *46 The remaining issue is whether respondent properly disallowed salaries paid by petitioner in the tax years to the wife and daughter of Burger as its secretary-treasurer and vice-president, respectively. The total amounts, especially as the record indicates they should be reduced, are small and we think on the evidence they must be determined to be reasonable. The uncontradicted testimony is that each officer performed some services. The vice-president was paid $100 in 1952 and $1,200 in 1953; the secretary-treasurer, $2,400 in 1952 and 1953. But the latter must be reduced to $1,200 for 1953, as will presently be discussed. We cannot find that the two officers, one a vice-president, the other secretary-treasurer, performed no services whatever in each of the 2 years and they were thus entitled to receive and petitioner to pay and deduct some amount as compensation. To deny the deduction entirely under such circumstances would be manifestly incorrect. See Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540; Estate of Pompeo M. Maresi, 6 T.C. 582, affd. (C.A. 2) 156 Fed. (2d) 929. All that petitioner's directors authorized as salary for the secretary-treasurer *47 for 1953 was $1,200. Nothing appears which would indicate that any greater amount was reasonable, and the amount deducted for that year should be decreased accordingly. With that adjustment, the payments to the two officers properly deducted is $2,500 for 1952 and $2,400 for 1953. Even though the burden was on petitioner to show the reasonable value of the services and we are admonished that our conclusion may bear heavily against petitioner, Cohan v. Commissioner, supra, the resulting amounts are so nominal for payment to two responsible officers that we cannot view them as unreasonably large nor justify the disallowance of any portion. Except to the extent of the modification already described, we think respondent erred as to this disallowance. A third issue involving the deduction of traveling expenses was raised by the pleadings. No evidence was introduced and no argument appears in the brief. The controversy has apparently been abandoned but if not, there is no evidence upon which we could find in petitioner's favor, and respondent's determination on this question must be sustained. Decisions will be entered under Rule 50. Footnotes
*. Includes a revenue agent's adjustment of $127,720.77.↩
1. "SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. "(b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders."↩
2. "* * * Petitioner in this case proceeded to trial on the theory that its obligations with reference to burden of proof were the same as it had been prior to the enactment of Section 534 of the Internal Revenue Code of 1954↩. In view of this position, the Petitioner takes the position that the notification letter and the statement in reply thereto can be ignored for the purposes of this proceeding." (Petitioner's reply brief.)