## TRICO PRODUCTS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.[1]

### No. 164.

(Circuit Court of Appeals, Second Circuit. July 19, 1943.)

Root, Clark, Buckner & Ballantine, Arthur A. Ballantine, and George E. Cleary, all of New York City, for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, J. Louis Monarch, and Morton K. Rothschild, Sp. Assts. to the Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This petition to review a decision of the Tax Court of the United States redetermining the surtaxes of the petitioner under § 102 of the Revenue Act of 1934, 26 U.S.C. A. Int.Rev.Acts, page 690, for the years 1934 and 1935, puts in issue whether or not there was substantial evidence to support the conclusion that the petitioner was "availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting gains and profits to accumulate instead of being divided or distributed. * * *"

The petitioner is a New York corporation which has made large profits in the manufacture and sale of its products among which an automatic windshield wiper for automobiles took first place. That was made and sold under a basic patent which

expired in 1942 and under improvement patents whose expiration dates are not shown but were in the more distant future. The petitioner was also in a strong position because of its management, experience, manufacturing facilities, financial resources and business contacts and contracts; and was, during each of the taxable years involved, reasonably expected to continue as a leading manufacturer in its field after its basic windshield wiper patent expired.

It had been incorporated in 1920 under a charter which empowered it not only to manufacture and sell as it did but to acquire, hold and dispose of stock, bonds and other securities. As it prospered, it indulged increasingly in the accumulation of securities by using part of its earnings for that purpose. It had taken over another corporation which the same men who organized it had incorporated in 1917 and by 1927 it was again ready for a change in its capital structure. By this time it had twenty-one stockholders, a majority of whom had been interested in the business from the start and its officers and directors were all from this original group.

In that year, a banking syndicate made a contract with the stockholders of the petitioner and S. H. Evans, petitioner's treasurer, as syndicate manager. Under the terms of this contract a recapitalization of the petitioner took place and resulted in the issuance of 225,000 shares of common stock without par value and entitled to share ratably in all dividends declared and of 450,000 shares of restricted stock without par value and entitled to share ratably in that part only of dividends which should be declared in excess of $2.50 in any one year on each of the free shares. There was no other kind of stock. The bankers agreed to, and did, purchase 175,000 of the unrestricted shares for $4,225,000 in cash; the twenty-one old stockholders took the rest of the unrestricted shares and all of the restricted shares were also taken by them. In accordance with the syndicate agreement all of the latter were put into a voting trust which provided for their release as free shares as follows:

"It is agreed that commencing January 1, 1928, up to 112,500 deferred shares may be exchanged for free shares accordingly as net earnings of the Company for the calendar year 1927 or for any year thereafter shall be equal to $5 per share upon the sum of the free shares then outstanding plus the number of free shares required for such exchange and in like manner commencing January 1, 1929, additional deferred shares up to 112,500 may be exchanged accordingly as the net earnings of the Company for the calendar year 1928 or for any year thereafter are equal to $6 per share on the sum of the free shares plus the free shares required upon such exchange and in like manner the remaining 225,000 deferred shares may be exchanged accordingly as the net earnings of the Company for the calendar year 1929 or for any year thereafter are equal to $9 per share on the sum of the then outstanding free shares plus free shares required upon such exchange; provided that as condition precedent to such exchange in 1928, dividends at the rate of $2.50 per share shall have been paid on the free shares from date of issuance and provided that at the date of each successive exchange herein provided for, dividends aggregating $2.50 shall have been declared and paid during the then next preceding twelve months upon the free shares then outstanding."

The voting trust could be ended at any time by the concurrence in such action of those holding a sixty per cent interest in it and it was terminated in 1929 when the twenty-one old stockholders, who had continued to hold all the restricted stock, replaced it with the Trico Securities Corporation. The latter was organized in that year "to take the place of the voting trust and acquired all the then restricted stock, amounting to 337,500 shares, from the original stockholders, who became stockholders of Trico Securities Corporation in proportion to their holdings of the restricted shares." Trico Securities Corporation continued to hold all of the shares which were restricted to and through the taxable years now in issue. Their number stood at 300,009 from 1930 through 1935. That corporation held 60,601 of the free shares by the end of 1930 and at the end of 1935 held 57,260 of such shares. The remainder was held by the original stockholders and by the public until in 1935 the petitioner acquired 12,415 which it held as "treasury stock."

The petitioner has paid a regular dividend of at least $2.50 each year since 1927 on all of the free shares outstanding. Each time restricted stock has been made free the original stockholders have received the benefit by way of the increase in dividend participation and should all the restricted shares be released the same

stockholders will get about seventy-five per cent of all dividends paid. There were some 1500 other stockholders in 1928 after the bankers had sold stock bought by the syndicate and their number had increased to about twenty-two hundred in 1935; but control of the dividend policy of the petitioner was always in the comparatively small group of old stockholders.

The petitioner increased the amount it had invested in operating assets from $5,229,805.72 in 1929 to $7,271,068.05 in 1935, and during the same period increased its investment in securities from $1,097,571.40 to $6,859,067.96. It was apparent that the building up of this security investment instead of the distribution in dividends of a substantial part of the funds so used did prevent the imposition of surtaxes in the years in question upon at least some of the stockholders of the petitioner. The point upon which decision on this petition must turn is whether the Tax Court was justified in reaching the conclusion that the purpose to prevent such imposition was in part the reason why the accumulations were made and kept. It had to weigh the contentions of the petitioner against those of the treasury and the latter's task was helped by the statute which in subdivision (b) made the fact that gains and profits are permitted to accumulate beyond the reasonable needs of the business prima facie evidence of a purpose to avoid the surtax. In so doing it considered at length the evidence showing what the petitioner had accumulated not only before and during the taxable years but had made large accumulations afterwards; its contentions that its purpose was not to prevent the imposition of surtaxes upon anybody but to build up the book value of its stock; to bolster its business position to meet the change in its business position which would take place upon the expiration of its basic patent in 1942; to enable it to meet the conditions for freeing its remaining restricted stock and the like; and having weighed all that against the position of the treasury that the accumulations were in excess of reasonable business needs concluded that the latter was correct. Many factors entered into that conclusion. The record shows that they were presented to the Tax Court and duly considered. The result reached by that tribunal was certainly a reasonable one arrived at with due regard for the right of the parties to be heard fully and fairly upon all relevant issues. That being so the result will not be changed upon a review of this kind. Helvering v. Chicago Stock Yards Co., 63 S.Ct. 843, 846, 87 L.Ed. ——, decided April 12, 1943. See, also, Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346. The reversal by the Supreme Court of Chicago Stock Yards Company v. Commissioner, 1 Cir., 129 F.2d 937, since this petition was filed shows the limited scope of our power to review.

Nor can we subscribe to the view that the prevention of the imposition of surtaxes must have been shown to have been the dominant factor behind the accumulations. Though the facts here, of course, differ from those in the Chicago Stock Yards Company case the following language of Mr. Justice Roberts applies here too: "A corporate practice adopted for mere convenience or other reasons, and without tax significance when adopted, may have been continued with the additional motive of avoiding surtax on the stockholders. The Board's conclusion may justifiably have been reached in the view that, whatever the motive when the practice of accumulation was adopted, the purpose of avoiding surtax induced, or aided in inducing, the continuance of the practice."

The evidence in this record gives substantial support to the decision of the Tax Court which must, accordingly, be made effective.

Affirmed.