WELLMAN OPERATING CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63326.    Filed October 30, 1959.

*Mark M. Horblit, Esq.*, for the petitioner.
*William T. Holloran, Esq.*, for the respondent.

OPINION.

RAUM, *Judge:* The challenged deficiencies were determined under section 102 of the Internal Revenue Code of 1939, which imposed a special surtax upon corporations formed or availed of for the purpose of preventing the imposition of surtax upon its shareholders by

permitting earnings or profits to accumulate instead of being divided or distributed.[1] Although a limited burden of proof in relation to accumulations beyond the reasonable needs of the business may be shifted to the Commissioner pursuant to section 534 of the Internal Revenue Code of 1954, as amended by sections 4 and 5 of Public Law 367, 84th Cong., 1st Sess., the ultimate burden of proving that the corporation was not availed of for the prohibited statutory purpose is and remains upon the petitioner. *Pelton Steel Casting Co.*, 28 T.C. 153, affirmed 251 F. 2d 278 (C.A. 7), certiorari denied 356 U.S. 958.

1. A preliminary issue is raised in this case as to whether the limited burden dealt with in section 534 of the 1954 Code[2] has been shifted. The pleadings show that the Commissioner sent a notice pursuant to section 534(b), and that the taxpayer filed a "statement," purportedly in compliance with section 534(c). Prior to trial petitioner filed a motion for a ruling that its "statement" is in compliance with the requirements of section 534(c), and that "by reason of such compliance, the burden is upon the respondent to prove that the net earnings accumulated with respect to each of the three fiscal years at issue were beyond the reasonable needs of the petitioner's business." However, at the trial, in order that it might be able to present its entire affirmative case first, petitioner stated that, without

---

[1] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation * * * if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax * * *

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

(c) EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

[2] SEC. 534. BURDEN OF PROOF.

(a) GENERAL RULE.—In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall—

(1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or

(2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection.

(b) NOTIFICATION BY SECRETARY.—Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * *

(c) STATEMENT BY TAXPAYER.—Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

waiving any rights under that motion, it did not press at that time for a ruling upon the motion.

We find it unnecessary to rule upon that motion because regardless of whether there has been any shifting of a limited burden of proof, we are satisfied on the evidence before us that the petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. However, it may be appropriate to point out certain respects in which petitioner's "statement" and motion are defective.

In the first place, the motion requests a sweeping ruling that the burden is upon the respondent to prove that the net earnings accumulated were beyond the reasonable needs of the business. Even if petitioner's "statement" were a proper one, no such broad ruling could be granted, for section 534(a)(2) provides for a shift in the burden only "with respect to the grounds set forth in such statement." And in the second place it is highly doubtful whether the "statement" filed by petitioner is a proper one under the statute.

The "grounds" upon which petitioner relies to establish that earnings and profits were not accumulated beyond the reasonable needs of its business were set forth as follows in petitioner's statement:

*Ground No. 1.* The corporation was not created or organized for the purpose of preventing the imposition of the surtax upon its shareholders.

*Ground No. 2.* The corporation was not availed of for such purpose in any of said three years, no part of the earnings accumulated in any of those years being beyond the reasonable needs of its business.

In our opinion, these are not "grounds," as that term was intended to be understood in section 534; rather, they are mere reformulations of section 102 itself. To shift the burden to respondent on the issue of "reasonable needs," petitioner's statement of "grounds" must allege *reasons* for accumulating earnings and profits which, if proved, will tend to establish that the earnings and profits were not accumulated unreasonably. Section 534 expressly requires "a statement of the grounds on which the taxpayer relies *to establish* that * * * earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business." (Emphasis supplied.) The relevant report of the Senate Finance Committee expresses a similar view:

in order for the burden of proof to be shifted, the taxpayer * * * must submit a statement indicating *why* the needs of the business require the retention of earnings and profits, together with facts sufficient to show the basis thereof. [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 315. Emphasis supplied.]

Petitioner's allegations that the corporation was not formed or availed of for the proscribed purpose, and that earnings were not accumulated beyond the reasonable needs of the business, are not reasons for accumulating earnings and profits, but rather conclusions

masquerading as reasons. As such, the statement is deficient for failing to allege appropriate grounds.

Nor are the facts alleged by petitioner in its statement sufficient to show the basis of its alleged "grounds." With respect to its real estate activities, petitioner sets forth certain instances when it bought and sold parcels of real estate, but no facts are alleged which would indicate a need to accumulate earnings and profits in order to consummate those transactions. Petitioner also alleges that in certain other instances "the corporation lacked sufficient means" to make purchases, but reveals nothing more than the names of the parcels involved; the statement does not indicate the dates the properties were considered, their estimated costs, any discussions, plans, or actions taken with respect to these properties, nor any other facts indicating a need to accumulate earnings and profits during the years in question.

Regarding its loans, investments, and related engineering contracts, petitioner merely recites various loans or investments that it did in fact make, and engineering contracts received as a result thereof; not a single instance is set forth showing that petitioner needed additional funds for this department of its business; the sum of petitioner's allegations on this point is a general statement that in the opinion of the directors additional "capital and surplus" was required to secure profitable engineering contracts from substantial textile manufacturing companies. Petitioner's allegations as to "the business of buying, converting and selling textile fabrics" consist of a single instance where it sold cotton goods at a profit and an allegation that "the directors have had to limit to $100,000 the amount to be devoted to that portion of its business." There are no facts alleged to indicate that the amount of $100,000 was insufficient for petitioner's merchandising activities, nor any instance set forth where petitioner was required to forego a profitable merchandising opportunity for lack of funds. The same may be said of petitioner's allegations concerning its interest in purchasing a textile mill. Six mills are listed as having been considered by petitioner and an allegation is made that petitioner offered to purchase three of them, but in no instance do the facts show that petitioner lacked the resources to purchase any one of the listed mills. Instead, petitioner contents itself with the general statement that "on several occasions, the corporation could have acquired such a mill, but was prevented by its limited means."

In sum, the "specific" allegations in petitioner's statement of "facts" consist of sketchy references to certain transactions, some of which were considered and others of which were consummated; they in no sense substantiate petitioner's general allegations of fact

that it was handicapped in its operations by insufficient resources. Such general allegations fail to satisfy the requirements of section 534. See *I. A. Dress Co.*, 32 T.C. 93; *Dixie, Inc.*, 31 T.C. 415, on appeal (C.A. 2); *Kerr-Cochran, Inc.*, 30 T.C. 69, on appeal (C.A. 8).

2. Section 102(c) states that "the fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." Apart from any issue of burden of proof, we think the record in this case persuasively demonstrates that petitioner's financial position at the beginning of and during the years in question was adequate to meet its business needs, both immediate and anticipated, that additional accumulations were unreasonable, and that the corporation was availed of for the purpose of preventing the imposition of surtax upon its principal shareholder.

As of February 28, 1950, the close of the last fiscal year prior to the period under review, petitioner had been a going corporation for more than 6 years during which time it had never paid a dividend in spite of substantial earnings. It had accumulated earnings and profits of $248,953.86 and current assets of $392,312, including cash of $70,406.90, notes and accounts receivable of $90,143.12, securities of $229,856.23, and a negligible closing inventory. Its current ratio (current assets at book cost to current liabilities) was 11 to 1. During the years under review, petitioner maintained its policy of not paying dividends, although substantial earnings continued. As of the close of the fiscal year ending February 28, 1953, its earned surplus had increased to $471,947.10, an increase of $222,993.24 over earned surplus at the beginning of the period. Current assets had increased to $635,491.73, including cash of $364,125.39, notes and accounts receivable of $43,975.11, securities of $227,391.23, and no closing inventory. Its current ratio had risen to 31 to 1. These figures are a graphic illustration of the accelerated accumulation of earnings and profits by petitioner, accompanied by increasing liquidity, particularly in the cash account. There were no reasonable business needs sufficient to justify such substantial accumulations.

*Loans, investments, and related engineering contracts.*—The record does not reveal a single loan or investment made, negotiated for, or contemplated by petitioner during the years under review in order to secure an engineering contract. Nor could Cox recall a single instance, in any year, in which petitioner was compelled to refuse a loan to a soliciting company because of lack of funds. Petitioner's net investment in stocks of other corporations actually declined during the years in question as its preferred stock in Fitzgerald

Mills Corporation was gradually redeemed. Similarly, the outstanding balance in "notes and accounts receivable" declined from $90,143.12 to $43,975 as Ferro Co repaid part of its loan.

Most of the stocks owned by petitioner during the years in question were held for Jefferson's convenience rather than for any business need of petitioner. Cf. *Kerr-Cochran, Inc.* v. *Commissioner*, 253 F. 2d 121 (C.A. 8), affirming a Memorandum Opinion of this Court. We cannot ignore the fact that Jefferson was in a high tax bracket, whereas the substantial annual dividends received by petitioner from its investments, particularly its stock in Iselin-Jefferson and Woodside Mills, were subject to the 85 per cent dividends-received credit provided by section 26(b)(1), I.R.C. 1939. Cf. *Trico Products Corporation*, 46 B.T.A. 346, 380, affirmed 137 F. 2d 424 (C.A. 2), certiorari denied 320 U.S. 790. Petitioner argues that its investments were necessary to secure or retain engineering contracts, or to maintain a close relationship with corporations whose activities would benefit petitioner in other ways. While this may, to some extent, be true as to petitioner's loans to Ferro Co and Locke, it is patently inapplicable to petitioner's investments in stock of other corporations. For example, no engineering services were rendered to Iselin-Jefferson, Woodside Mills, Alabama Mills, Exposition Cotton Mills, or Package Machinery Company. The facts also demonstrate that in some instances petitioner obtained profitable engineering contracts from corporations in which petitioner owned no stock and to which no advances were made, e.g., Conestogo Cotton Mills and Barret Textile Company. Moreover, whatever business benefits accrued to petitioner from its relationships with Iselin-Jefferson would undoubtedly have accrued even if Jefferson retained all his shares in that company instead of selling a portion to petitioner. Jefferson was cochairman of the board of Iselin-Jefferson and a substantial stockholder; Floyd, Jr., was president of Iselin-Jefferson and also a stockholder; both were voting trustees of all the Iselin-Jefferson stock held by the Jefferson family and corporations controlled by them. A similar statement may be made as to the business necessity of holding Woodside Mills stock inasmuch as that corporation was controlled by Iselin-Jefferson. Petitioner's investments in Iselin-Jefferson and Woodside Mills represented a total investment of $170,000, approximately 70 per cent of the total basis of the stocks held by petitioner as of February 28, 1951. Purchase of the Fitzgerald Mills Corporation preferred stock was prompted by the prospect of its anticipated redemption at a premium rather than any purpose relating to petitioner's engineering contract with that company. Fitzgerald Cotton Mills was not even an operating company during the years under review; prior to February 1945, when that

company did operate a textile mill, it paid $24,000 per year to petitioner for engineering fees, even though petitioner owned none of its stock. Thus, it appears that of petitioner's investments only its common stock interest in Fitzgerald Mills Corporation was even arguably necessary to its engineering business. And, even as to that company, there was no apparent business necessity for purchasing a controlling interest therein, if petitioner's purpose was merely to secure or retain an engineering contract. Fitzgerald Mills Corporation was the successor to Fitzgerald Cotton Mills which was wholly owned by the Jefferson family; petitioner already had an engineering contract with Fitzgerald Cotton Mills when Fitzgerald Mills Corporation was formed; and Floyd, Jr., was the president of Fitzgerald Mills Corporation. It therefore seems probable that Fitzgerald Mills Corporation would have continued to employ petitioner whether or not petitioner purchased a majority of its stock. Furthermore, the amount of petitioner's investment in Fitzgerald Mills Corporation—$27,500—seems to bear little relation to the size of its engineering contract—$24,000 per year. The loans to Ferro Co and Locke respectively were made before and after the taxable years in question. Petitioner's prospects for making similar loans during the years under review were minimal in view of the continuing state of depression in the textile industry, as documented by petitioner's minutes and Cox's statement that "there was no use interviewing mills, at the present time, in regard to making loans to mills." And, finally, it appears that the loans to Locke and Ferro Co were the only loans ever made by petitioner—before, during, or after the years in question—with respect to engineering contracts. In short, we think petitioner's argument that it needed additional investment funds to carry on the engineering phase of its business is largely fictitious; the fact is that petitioner had more than adequate resources for this purpose, so much so that it was able to carry many investments that had no, or only a remote, connection with its engineering contracts, or other activities. See *Jacob Sincoff, Inc.*, 20 T.C. 288, affirmed 209 F. 2d 569 (C.A. 2).

*Possible purchase of a textile mill.*—Although petitioner earnestly contends that it needed to accumulate earnings and profits in order to purchase and stock an operating textile mill, there are several dramatic features to the evidence which foreclose a finding consonant with this contention. First, from March 1944 to December 1958, a period of more than 14 years, petitioner did not purchase a textile mill, although during this period petitioner allegedly desired to engage in the business of operating a textile mill. Second, with one exception, petitioner's activities with respect to acquisition of an operating mill never passed the discussion stage. *KOMA, Inc.* v.

*Commissioner*, 189 F. 2d 390 (C.A. 10), affirming a Memorandum Opinion of this Court. Victoria Mills was the only mill [3] during the 14-year period for which a purchase offer was submitted, but that offer was made by a syndicate which was dominated by Swergold and in which petitioner had only an undisclosed interest. Third, after repeated questioning by the Court in an effort to pin down the precise reason for petitioner's failure to purchase the Superba mill, Jefferson admitted that such failure was attributable to factors extraneous to the availability of funds or resources. The Superba mill was sold to another purchaser for $250,000 in July 1951; as of February 28, 1951, petitioner had earned surplus of $360,023.57, current assets of $521,705.61, and total "quick" assets of $300,764.38, including cash of $230,154.73. Fourth, although we are prepared to accept as generally true petitioner's contention that substantial amounts are necessary to stock a mill for operation after its fixed assets have been purchased, we are not satisfied that petitioner intended to purchase a mill for purposes of operation during the years under review. In 1948 petitioner's minutes record its decision to enter the business of "buying and selling cotton mills," and petitioner did in fact agree to sell both the Superba and Russellville mills in return for a commission. The depressed state of the industry during the years in question, which prompted Cox to report that as of May 1952 the only mills available were "very old ones in poor condition and not worth considering irrespective of the prices," substantiates our doubts as to the seriousness of petitioner's intentions regarding operation of a mill at that time. Fifth, the evidence does not support petitioner's claim that lack of resources was the reason for not purchasing a mill. Jefferson admitted the contrary with respect to Superba Mills. As an additional example, petitioner's minutes document the fact that a large part of the alleged $500,000 required to purchase the Royston Mill could have been quickly recovered through the sale of inventory; and, the fact that sale of inventory was contemplated indicates that petitioner would not have had to expend large amounts to stock that particular mill. Petitioner's minutes, otherwise detailed with respect to mills considered for purchase, nowhere mention lack of resources as an inhibiting element. It seems clear that petitioner's resources on hand at the beginning of, and during, the years in question were more than adequate with which to purchase a mill, wholly apart from the possibility of financing a portion of the purchase price by borrowing from a third

---

[3] Although Jefferson testified that an offer was also made for the Superba mill, we have concluded on the basis of Cox's testimony and the minutes of petitioner's board of directors that no such offer was ever made.

party. Viewing the record as a whole, petitioner's allegation that lack of resources handicapped it in its search for a mill leaves us with a sense of unreality; we think such allegation was primarily an afterthought and in no way influenced petitioner's intentions with respect to purchase of a mill during the years in question.

*Real estate activities.*—We agree with respondent's statement on brief that "petitioner purchased all of the real estate properties it desired, prior to, during and after the years in issue and at no time were its operations in this department hampered or restricted by a lack of funds." The record is plain that in no case did insufficient resources force petitioner to reject or postpone any real estate opportunities otherwise desirable from a business viewpoint.

If petitioner lacked resources, why did it spend approximately $77,000 in cash to purchase and improve the property at 17 Sutton Place, rent it at a loss to Floyd, Jr., for 6 months, and then sell it to him for $10,000 down and a $70,000 mortgage? This transaction, which occurred during the years in issue, appears to be completely inconsistent with a present need for liquid resources; it indicates instead that petitioner's real estate activities were not always motivated by business considerations so much as the personal convenience of the Jefferson family. A similar conclusion suggests itself with respect to at least two of the Southampton properties which the Jeffersons rented for their own occupancy in "some summer months" and the Doubling Road property which they similarly continue to rent. In this connection, petitioner's expenses in operating its properties exceeded the rental income therefrom during the years in question.

The possibility of erecting a multiple-story office building at 90 Worth Street, which petitioner alleges was still being considered during the years in issue, never went beyond the discussion stage, and the record indicates that most of the discussions took place in 1946 and 1947. Petitioner's minutes do not even mention this project, and Taylor admitted that he approached Jefferson as an individual with substantial assets under his control, rather than as a representative of petitioner. Cf. *Dixie, Inc., supra,* at 428–429. The only indication that petitioner was at all concerned with the project was Jefferson's statement during the discussions that petitioner might participate therein, but the extent of such participation was never defined. If anything definite can be said about this venture, it is that Iselin-Jefferson would be its primary beneficiary; the benefit to petitioner, if any, would be incidental. In any event, consideration of the project was dropped as a result of the increasing movement of textile firms from downtown New York City to uptown locations,

and not for lack of resources. And it seems probable that similar reasons played a part in Jefferson's rejection of the other buildings in the downtown textile area offered to him by Taylor.

As far as the S. Vere-Smith property is concerned, there is no proof that petitioner contemplated its purchase during the years in issue. It is first mentioned in the minutes of October 10, 1953, and petitioner's first offer was made in November 1953. Furthermore, petitioner failed to obtain this property for reasons other than a lack of resources and, even if petitioner had succeeded in purchasing the property, it was contemplated that a substantial part of its investment would be recovered through resale of most of the acreage.

In short, petitioner has failed completely to substantiate its allegation that insufficient resources limited its real estate activities.

*Merchandising.*—Petitioner's merchandising ventures during the years in question, in cotton goods and jewelry, were at best sporadic. Although the minutes document petitioner's decision in February 1952 to enter the converting business and hire Maynard at $5,000 per year, the record is clear that petitioner's plans in this regard were not restricted by insufficient resources. Petitioner never refused an opportunity to purchase merchandise which it thought it could resell at a profit, it had no closing inventory in any of the fiscal years with which we are concerned, and, from all that appears in the record, the amount of $100,000 allocated to this phase of its business was more than adequate.

Throughout its business history petitioner has accumulated its earnings and profits for no apparent business need. The most substantial source of these accumulations has been income from dividends and interest which, during each of the years under review, exceeded its income from engineering fees. Petitioner's rental income during this period was more than offset by expenses of operating its real estate holdings, and the only significant gain from sale of a property was that realized on disposition of the apartment building transferred to petitioner by Jefferson in 1943 or 1944. The corporation was utilized in substantial measure for Jefferson's personal convenience, the substantial accumulations of earnings enabled him to avoid imposition of surtax, and we conclude on all the evidence that petitioner was availed of during the years in question for the purpose of preventing the imposition of the surtax upon its shareholders.

*Decision will be entered for the respondent.*