Youngs Rubber Corporation v. Commissioner.
Youngs Rubber Corp. v. Commissioner
Docket No. 86387.
United States Tax Court
T.C. Memo 1962-300; 1962 Tax Ct. Memo LEXIS 7; 21 T.C.M. (CCH) 1593; T.C.M. (RIA) 62300; December 26, 1962
*7 Held, petitioner was availed of in the year 1956 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Vincent J. Jennings, Esq., 60 Park Pl., Newark, N.J., for the petitioner. J. Q. Smith, Esq., and John E. McDermott, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioner's income tax for 1956 in the amount of $25,056.53. The sole issue is whether petitioner was availed of during the year 1956 for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Findings of Fact Some of the facts were stipulated and they are herein included by this reference. Youngs Rubber Corporation, hereinafter sometimes called the petitioner, is a corporation organized under the laws of the State of New York in 1920, with its principal place of business in New York, New York. Petitioner filed its income tax return for 1956 with the district director of internal revenue for Lower Manhattan, New York, *8 New York. Petitioner keeps its books and files its Federal income tax returns on an accrual basis. Since 1920 the petitioner has been engaged in the marketing of rubber prophylactics through wholesale drug houses and drug stores. During the years 1956 and 1957 the common stock of petitioner was owned as follows: Shares
Percent
Merle L. Youngs, Treasurer
957
94.6
Olive M. Youngs (wife of
Merle L. Youngs)
41
4.1
John MacFarlane, President
11
1.1
Treasury Stock
2
.2
1,011
100.0
Merle L. Youngs, the founder of the petitioner, was paid a salary of $103,241.60 for the year 1956. All of the rubber prophylactics sold by petitioner are manufactured by Youngs Rubber Corporation, a New Jersey corporation (hereinafter called YoungsNew Jersey), in which petitioner owned 25 percent of the outstanding stock in 1956. Its Certificate of Incorporation was issued by the State of New Jersey to its predecessor, Capital Rubber Corporation, on March 1, 1920, with an authorized capital stock of 500 shares with a par value of $50. Arthur M. Youngs, who died October 17, 1955, became a stockholder of YoungsNew Jersey in 1921 and over a period of years sold stock to his brothers, Carey L. Youngs and Merle L. Youngs, so that *9 by 1930 the outstanding stock was held as follows: Arthur M. Youngs and wife, 95 shares; Carey, 47 shares; and Merle, 48 shares. In 1931 Arthur created a trust for each of his three sons, divesting himself almost entirely of stock holdings. After the death of Arthur's wife in 1940 and the death of Carey L. Youngs in 1948, the outstanding stock was held as follows: Shares
Arthur M. Youngs & Trust
95
Petitioner (acquired at a cost of
$99,475.50)
47
Merle L. Youngs
48 After the provisions of the will of Arthur M. Youngs were carried out the outstanding stock of YoungsNew Jersey was held as follows: Shares
William J., Gordon L. and Allan
R. Youngs
95
Petitioner
47
Merle L. Youngs
48
When Carey, who had been an executive officer and director of petitioner, died in 1948, the petitioner continued monthly payments of $5,315.30 to his widow over a total period of 24 months. Petitioner also agreed to purchase from Carey's widow her 2 shares of stock in petitioner for $2,000 and 47 shares of stock in YoungsNew Jersey for $99,475.50. YoungsNew Jersey geared its production to the needs of petitioner. When the level of petitioner's inventory at the Newark, New Jersey warehouse fell to a predetermined level, *10 YoungsNew Jersey would manufacture and ship its production of two or three days to the warehouse, billing petitioner immediately. Petitioner did not share responsibility for the manufacturing operation conducted by YoungsNew Jersey. Other than an advance of $80,000 made by petitioner to YoungsNew Jersey in 1945, petitioner has made no advances or loans to YoungsNew Jersey for construction purposes. Respondent in 1957 assessed against petitioner a deficiency of $3,201.06 plus interest of $116.77 primarily due to the disallowance of $6,000 traveling expenses. Petitioner paid the deficiency plus interest and Merle L. Youngs, who in turn was charged with this additional amount of income, paid the additional tax on account thereof. In the same manner $5,000 was disallowed to petitioner and charged as income to Merle L. Youngs, as excess travel expenses in 1955, on which petitioner and Merle Youngs paid additional tax. Merle L. Youngs died on October 8, 1958 at the age of 72 years and the board of directors of petitioner continued his salary ($8,486.80 per month) to his widow for a period of 24 months. On December 18, 1958 the board of directors authorized petitioner "to advance, to *11 the Estate of Merle L. Youngs on account of the redemption of stock held in Youngs Rubber Corporation of New York or New Jersey such sums that may become available through cancellation of prior commitments, projects, and other needs established in the Corporate minutes, making possible thereby the payment of Estate, Inheritance, and other taxes [of the Estate of Merle L. Youngs] * * *." The following estate and inheritance taxes were paid by Merle L. Youngs' estate in 1960 and 1961: Federal
New York
Year
Estate Tax
Inheritance Tax
1/ 4/60
$350,486.66
$ 54,344.19
11/ 8/61
77,111.78
23,815.62
$427,598.44 *
$ 78,159.81
Interest
7,638.99
4,600.41
$435,237.43 *
$ 82,760.22 Executors' commissions and legal fees for the Estate of Merle L. Youngs were $180,000. On October 4, 1948 an agreement was executed by one Perry H. Stevens, Merle L. Youngs and Arthur M. Youngs reciting that the parties had acquired the full interest in the "Killian Patents" at an approximate cost of $2,000,000 in the proportion of 25 percent to Stevens, and 37 1/2 percent to Merle and Arthur. On October 19, 1948 Merle agreed to assign his 37 1/2 percent interest to petitioner *12 for $612,500 plus commission of $37,500, which offer was accepted by petitioner, and a similar offer was made by Arthur and accepted by YoungsNew Jersey. Merle and Arthur had signed notes totaling $1,500,000 in connection with this transaction, and these obligations were assigned to petitioner and YoungsNew Jersey, together with the patent rights. On July 28, 1950 the petitioner's board of directors voted to borrow $700,000 from a bank in conjunction with YoungsNew Jersey. The original installment notes had a balance of $1,054,000 due as of August 1, 1950. On July 31, 1950 this obligation was paid in full by check in the amount of $900,000 (the balance was discounted by the creditor) which amount included the $700,000 borrowed from the bank. Petitioner and YoungsNew Jersey agreed to forego payment of dividends and capital improvements while the loan was outstanding. Petitioner and YoungsNew Jersey paid off the loan in 1954. The Killian patents were in 1953 declared to be invalid pursuant to litigation. Petitioner's sales over the years 1946 through 1956 were as follows: Year
Amount
1946
$3,831,167
1947
4,565,577
1948
4,501,231
1949
4,512,219
1950
4,864,922
1951
4,789,554
1952
4,821,674
1953
4,787,043
1954
4,598,698
1955
4,819,898
1956
5,238,098
*13 Petitioner sold its product to a total of about 400 customers. Total sales to the 10 principal customers of petitioner during the years 1953 through 1956 were as follows: 1953
1954
1955
1956
McKesson & Robbins
$1,060,250.24
$ 988,749.38
$1,037,282.71
$1,069.616
Brunswig Drug Co.
59,816.96
56,953.48
78,563.84
148,643
Ketchum & Co.
17,156.05
22,241.17
25,393.78
128,595
D. Kaltman & Co.
80,566.96
80,198.72
77,780.44
134,851
Southwestern Drug Co.
57,276.58
56,767.93
46,078.83
56,765
Cunningham Drug
34,800
Rexall Drug
65,081.31
54,202.65
58,493.56
68,887
United Whelan
56,636.02
55,736.90
58,116.66
67,134
Sav-On-Drugs
8,863
Walgreen
44,711.63
43,317.53
41,450.62
43,837 Petitioner's net profit and surplus during the years 1947 through 1958 were as follows: Other
Net Surplus
Net Increase
Surplus at
Year
Net Profit
Income Tax
Adjustments
in Surplus
End of Year
1947
$811,838.98
[354,327.28)
[12,310.85)
$445,200.85
$2,025,149.11 * *14 1948
210,072.98
(9,720.69)
9,160.69
209,512.98
2,234,662.09
1949
273,890.35
(178,079.09)
(29,871.57)
65,939.69
2,300,601.78
1950
305,251.10
(138,621.68)
33,018.24
199,647.66
2,500,249.44
1951
123,403.78
(49,280.44)
(14,442.74)
59,680.60
2,559,930.04
1952
135,946.49
(78,451.88)
(33,397.89)
24,096.72
2,584,026.76
1953
258,085.82
(145,401.59)
(36,796.99)
75,887.24
2,659,914.00
1954
307,581.64
(157,264.89)
(25,265.91)
125,050.84
2,784,964.84
1955
237,615.02
(148,488.87)
26,493.42
115,619.57
2,900,584.41
1956
172,207.96
(88,214.28)
(7,775.52)
76,218.16
2,976,802.57
1957
325,929.95
(180,121.43)
(5,314.99)
140,493.53
3,117,296.10
1958
481,489.04
(227,873.71)
(11,346.84)
242,268.49
3,359,564.59 As of December 31, 1956 the petitioner had on hand Treasury Notes and bonds in the amount of $338,407.17, which were among the assets until 1958. In February 1959, $200,000 of the notes and bonds were redeemed, and at that time the sum of $200,000 was advanced by petitioner to the executors of the Estate of Merle L. Youngs. As of November 14, 1960, 10,000 shares of stock in petitioner had been pledged by the Estate of Merle L. Youngs to petitioner to secure an advance of $400,000. On that date it was proposed by the executor of the Estate to pledge an additional 5,000 shares to secure a further advance of $200,000. Petitioner's cash account as of December 31, 1956 amounted to $637,231.26 and consisted of the following items: cash, $234,207.81; dedicated funds, $262,807.94; life insurance, (cash surrender value), $65,944.08; payroll funds, $73,316.03; petty cash, $263.76; and War Bond account, $691.64. Petitioner made a dividend distribution to its shareholders in 1946 and this was the last dividend distribution made by petitioner until the year 1959. The cash dividend paid as *15 of December 19, 1946 was in the amount of $106,155.50. On December 31, 1946 the petitioner's balance sheet lists "Boats" among its assets at a cost of $40,445.39. In June 1947 the Alondra was sold for $25,000 though petitioner used the boat for the rest of the year. On December 31, 1950 the asset "Boats" is shown on petitioner's balance sheet at a cost of $131,912.98; on December 31, 1951 the cost appears as $138,453.32 and on December 31, 1954, $148,912.16. Boat expenses and depreciation were charged to petitioner during these years. In 1956 all of the boats (shown at cost amounts of $6,186.96, $6,186.96, $126,079.40 and $10,458.84) were sold. Petitioner sold three of the boats (a yacht and two sailboats) to Merle L. Youngs for $98,057.40. Petitioner also owned an entertainment center shown on petitioner's books at a cost of $24,106.24 during the years 1946 through 1956. Petitioner paid the expenses of the center and also claimed depreciation on the center. The center, which was called "The Birches" and was located at Clayton, New York, was placed on the market for sale by the petitioner in 1960. Merle L. Youngs received an annual salary of $51,960 in each of the years 1946, 1947 *16 and 1948, about $72,750 in each of the years 1951 and 1953, $101,841.60 in each of the years 1954 and 1955, and $103,241.60 in 1956. The minutes of petitioner's board of directors meeting of June 15, 1946 mentioned plans to acquire direct or indirect control of six service wholesale drug houses throughout the United States and adopted a resolution to acquire as soon as possible a wholesale drug house, appropriating $300,000 from the current profits of the petitioner to carry out the intent of the resolution. In 1947 petitioner purchased a controlling interest in the R. H. Johnson Drug Co. (later changed to Johnson Drug Co.), a wholesale drug company in Tampa, Florida. Petitioner invested $340,000 in 3,400 shares in Johnson Drug (Tampa) in 1947 and $50,000 in 500 shares of stock in 1951. As of December 15, 1956 Johnson Drug (Tampa) had advanced $24,288.48 in merchandise to Johnson Drug (St. Petersburg) and by June 30, 1957 the advance had increased to $252,636.99. As of June 30, 1956 the accumulated surplus of Johnson Drug (Tampa) was $283,904.97, representing an increase of about $280,000 since June 30, 1950. Its annual net income increased from $31,298.68 for its fiscal year ended *17 June 30, 1950 to $181,592.82 for the fiscal year ended June 30, 1956. On September 29, 1947 petitioner was authorized by its board of directors to borrow $600,000 for the purpose of acquiring controlling interest in Holland-Rantos Company, Inc. (a New York corporation hereinafter called Holland-Rantos) and operating it. Holland-Rantos manufactured and sold ethical drugs, contraceptive devices, jellies, ointments and druggists' sundries to wholesale service drug houses, hospitals, doctors and surgical supply companies. Petitioner purchased all the outstanding stock of Holland-Rantos on November 14, 1947 for a total consideration of $562,000. The sales and administrative staff of petitioner and Holland-Rantos were then consolidated. Petitioner made a cash payment of $300,000 in 1947 on the purchase price, with the balance to be paid in eight equal annual installments. On January 2, 1948 YoungsNew Jersey purchased one-half of the Holland-Rantos stock from petitioner for $282,778.28 and gave its note to petitioner in payment. YoungsNew Jersey paid its note to petitioner in 1950. Petitioner made advances of money to Holland-Rantos at various times and the outstanding balances of such *18 advances were as follows: December 31, 1948, $153,336.54; December 31, 1951 and 1952, $135,000; December 31, 1953, $170,000; December 31, 1954, $240,000; December 31, 1955, $285,000; and December 31, 1956, $330,000. In 1959 Holland-Rantos repaid $200,000 to petitioner, leaving an outstanding balance owing to petitioner as of December 31, 1959 in the amount of $200,000. Holland-Rantos showed the following net income or (loss) from October 1, 1947 through 1959: 10/1/47 - 12/31/47
($ 12,557.82)
1948
21,621.18
1949
89,273.86
1950
94,035.73
1951
( 1,455.43)
1952
( 8,764.39)
1953
( 170,371.78)
1954
( 95,812.67)
1955
( 2,842.49)
1956
42,117.18
1957
73,516.37
1958
137,973.59
1959
222,058.74
Holland-Rantos had executed a research contract with Battelle Memorial Institute for the development of a spermicide to be used in a jelly base and a contraceptive for oral administration. On January 6, 1953 petitioner, in conjunction with YoungsNew Jersey, agreed to assume the outstanding Battelle Research Project contract dated July 11, 1952. This contract was renewed on October 10, 1956 in a total amount of $25,000 for one year ending September 30, 1957. The balance on the contract as of December 31, 1956 was $21,631.60. Payments *19 on this contract were charged currently to research expenses as paid. Under authorization of the board of directors on January 6, 1954 the petitioner purchased four acres of land in New Brunswick, New Jersey, for the purpose of constructing a warehouse. Petitioner's estimate (according to the minutes of January 5, 1955) for the warehouse was $200,000. Petitioner ultimately sold the land in New Brunswick and did not construct a warehouse on the site. In 1954 petitioner decided to establish a branch in Canada and this was done in 1955 in conjunction with YoungsNew Jersey. Petitioner incurred the following losses from the operation of its Canadian branch: 1956, $79,978.50; 1957, $121,406.99; 1958, $57,930.37; and 1959, $58,610.88. In 1955 petitioner decided to acquire a site in St. Petersburg, Florida, and construct a wholesale drug house similar to the one in Tampa. In 1956 petitioner organized the Johnson Drug, Inc. in St. Petersburg (hereinafter called Johnson Drug (St. Petersburg)) and invested $170,000 in its stock. An additional $125,000 was invested in its stock by petitioner in 1957 and $100,000 in 1959, making a total investment by petitioner in Johnson Drug (St. Petersburg) *20 of $395,000. The minutes of the December 19, 1956 stockholders' meeting of petitioner stated, in part, as follows: The Treasurer also invited attention to the fact that a new home for Johnson Drug Co. of Tampa, Florida would be needed because of a projected thruway that requires our subsidiary to abandon the present location. Mr. Johnson estimated that $150,000.00 at least would be required in excess of the condemnation price to build a new home. * * *
The survey for the establishment of the third service wholesale house was then discussed. This study indicated that West Palm Beach would provide a profitable location for a wholesale service house of the approximate size of the Tampa house. This establishment would require a contribution of capital on our part of $200,000.00 and borrowings at local banks of a similar amount, $400,000.00 being the limit of capital believed necessary. The minutes of petitioner's stockholders' meeting of December 19, 1956 indicate a discussion that further manufacturing space was required for Holland-Rantos in Trenton, New Jersey, that would cost a total of $300,000, with petitioner's share of the cost to be $150,000. These plans for increased space in *21 Trenton were never carried out by petitioner. As of December 31, 1956 petitioner and Holland-Rantos occupied leased premises at 145 W. Hudson Street, New York, New York, with 13 months remaining on the lease at a monthly rental of $1,250. Between August 1956 and January 1957 petitioner had ordered $216,641.55 of supplies which were undelivered at that time and which would be paid after delivery. On December 31, 1956 leases were outstanding on automobiles from Hertz involving future rentals of about $47,000. From 1930 to 1959 petitioner has been involved at various times in litigation involving antitrust, trademark and patent infringement, and unfair trade. Petitioner's inventories of merchandise and packing supplies were as follows: December 31, 1955
$584,437.09
December 31, 1956
481,917.22
December 31, 1957
748,969.15
During the early 1950s there was fairly widespread research in the field of fertility control and by 1955 advances had been made in the field of oral contraceptives, centering upon the drug known as "steroids". Enovid is a drug of this group and in the early part of 1956 the actual field work for testing Enovid was begun. G. D. Searle & Co. obtained authority from the Food *22 and Drug Administration and placed on the market the oral contraceptive "Enovid" in August 1957. On December 31, 1955 petitioner had total assets of $3,298,280.01. Its current assets totaled $2,323,335.98 and consisted of the following items: Current Assets: Cash Control (A-1)
$ 510,030.04
Canadian Branch Control
72,304.08
Inventory - Merchan-
dise
$363,276.54
Inventory - Packing
Supplies
221,160.55
584,437.09
Notes Receivable
7,500.00
Accounts Receivable (A-2)
787,532.32
Prepaid Items (A-4)
25,127.88
Securities - U.S. Government
Bonds & Mortgages
336,404.17
Total Current Assets
$2,323,335.58 Petitioner as of December 31, 1955 had current liabilities of $349,145.60; capital stock, $48,550; total retained earnings, $2,398,434.41 and a reserve for expansion and working capital of $502,150. The reserve for expansion and working capital in the amount of $502,150 first appeared in petitioner's balance sheet as of December 31, 1946. Petitioner's profit and loss statement for 1956, as per its income tax return, shows the following: Sales
$5,009,641.57
Less: Cost of Goods Sold
2,629,376.41
$2,380,265.16
Add: Miscellaneous
13,905.81
Gross Profit on Sales
$2,394,170.97
Less: Total Expenses
2,221,963.01
Net Income
$ 172,207.96
*23 Petitioner's balance sheet as of December 31, 1956 (as per its 1956 income tax return) shows the following items: Cash
$ 637,231.26
Notes & acc. receivable
561,400.94
Inventories
481,917.23
U.S. Govt. Bonds
338,404.17
Other investments *
777,253.77
Prepaid expense
30,614.53
Buildings & other fixed depreciable
assets (net)
63,250.26
Depletable assets (net)
38,697.68
Other assets **
667,951.88
$3,596,721.72
Amounts payable
$ 320,475.19
Accrued Expenses
248,894.06
Capital Stock
50,550.00
Surplus Reserves - expansion
502,150.00
Earned Surplus
2,474,652.47
$3,596,721.72 * Johnson Drug Co. (Tampa)
$ 390,000.00
Youngs New Jersey
99,475.50
Holland-Rantos
282,778.27
Elmhurst Rubber Co.
5,000.00
$ 777,253.77 ** Johnson Drug (St. Petersburg)
"Construction loan"
$ 170,000.00
Holland-Rantos - "Loan"
330,000.00
Toronto Branch
165,951.88
Treasury Stock
2,000.00
$ 667,951.88
If petitioner had made a dividend distribution of its current earnings to Merle L. Youngs and his wife in 1956, their income tax liability would have been increased by $64,340.86. On August 24, 1959 respondent mailed to petitioner a notification as provided by section 534(b) of the Internal Revenue Code of 1954, [1] with respect to the proposed accumulated earnings tax for the *24 year 1956 under section 531. Within an extended period of time the petitioner submitted a statement giving the grounds upon which it relied, pursuant to section 534(c), to establish that all or any part of the earnings and profits were not permitted to accumulate beyond the reasonable needs of the business. Respondent in the statutory notice of deficiency determined that petitioner was availed of for the purpose of avoiding income tax upon its stockholders through the medium of permitting its earnings and profits for the year 1956 to be accumulated beyond the reasonable needs of its business instead of being divided or distributed. Opinion The only issue is whether petitioner was availed of in 1956 for the purpose of avoiding income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. Section 532. The question is one of fact. Helvering v. National Grocery Co., 304 U.S. 282. Section 533 provides that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable *25 needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Section 537 provides that "the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business." Section 534 places the burden of proof on respondent on the question of accumulation beyond reasonable needs if the corporation has submitted a statement of the grounds and facts on which it relies to show there was no accumulation beyond reasonable needs. Petitioner listed five major grounds in its section 534 statement, namely: (1) to provide for expansion of business and replacement of plant; (2) to acquire business enterprises through purchase of stock or assets; (3) to provide necessary working capital; (4) to provide for investments or loans to suppliers or customers; and (5) to provide for the continuance of its business on the death of its principal stockholder-officer. Under each major group petitioner then lists a variety of items. Petitioner had accumulated a surplus of $2,900,584.41 by December 31, 1955 and as of December 31, 1956 petitioner's *26 surplus increased to $2,976,802.57, or an increase of $76,218.16 for the year 1956. On brief the petitioner contends that its capital anticipated needs in 1956 amounted to $3,408,273.15. Petitioner's first ground in the section 534 statement to justify its accumulation is to provide for expansion of business and replacement of plant. In American Metal Products Corporation, 34 T.C. 89, affd. 287 F. 2d 860, the Court stated that "[while] there is little doubt that a corporation's earnings and profits may be accumulated for purposes of expansion and modernization * * * such 'grounds' must be supported [in the section 534 statement] by substantial, material, and definite facts and by clear and specific plans." Petitioner mentions a warehouse in New Brunswick, New Jersey, and a second floor added to a building in Trenton, New Jersey (premises of YoungsNew Jersey) to provide for additional manufacturing space. Petitioner estimates $200,000 for the cost of the warehouse and $150,000 for the additional floor. But petitioner fails completely to present, either in its statement or at the trial, any facts or plans of the necessary specific nature. At most, we have minutes of the various meetings, *27 but these are devoid of any explicit facts or plans, and there is nothing to indicate any definite planning or authorization or execution of any specific commitment. See Nemours Corporation, 38 T.C. - (Aug. 10, 1962). It is true that petitioner purchased a four acre tract in 1954 to construct a warehouse, but nothing further was done about it, and the petitioner finally sold the land subsequent to 1956. In this connection, we think it significant that as early as 1947 petitioner had vague plans about constructing a warehouse and set aside a reserve of about $500,000 for this and other purposes. The reserve remained intact until at least the end of 1956. We also note that the additional floor in Trenton was ostensibly for the use of Hollard-Rantos, a separate corporation in which both petitioner and YoungsNew Jersey had an investment. We are not at all persuaded that this would be considered a reasonable need of petitioner's business. Another item under this first ground for accumulation is a reserve for technological change in the industry which petitioner places at $500,000. About all we are told about this is that oral contraceptives have appeared on the market but the statement *28 and the record make absolutely no attempt to link the $500,000 with any specific plan to meet this competitive threat, or for that matter, to show that a competitive threat even existed. In fact, petitioner's sales, which were $5,238,098 in 1956, rose steadily over the next few years and in 1960 reached $6,865,519. Moreover, the competitive threat, whatever its magnitude, was certainly minimized by petitioner's acquisition of a controlling interest in Holland-Rantos, which manufactured a line of different types of products similar in purpose to petitioner's product Petitioner treats this particular investment as a separate item in its list of reasonable needs. Also, petitioner in conjunction with YoungsNew Jersey had assumed a research contract in 1953 with the Battelle Memorial Institute for the development of a spermicide to be used as a jelly base and a contraceptive for oral administration. This contract was renewed on October 10, 1956 in a total amount of $25,000 for one year ending September 30, 1957. It is obvious then that petitioner took steps to diversify its products and to remain in step with developments within its field. But there is no basis whatever in the record for *29 an accumulation in 1956 of $500,000 for what petitioner on brief calls "[technological] Progress". Vague and unsupported premonitions of the future cannot be accepted as "reasonable needs of the business" within the meaning of the statute. As to these items under the first ground listed by petitioner in its statement, the lack of specific facts makes them inoperative to shift the burden to respondent and, furthermore, the record contains no evidence to support these particular items as reasons for accumulation. Another ground for accumulation in petitioner's statement is to provide funds which would, in effect, enable the estate of petitioner's founder and controlling stockholder, Merle L. Youngs, to pay Federal estate taxes, State taxes, executor's commission and legal fees. Petitioner alleges that $800,000 was a necessary reserve for this contingency. Merle L. Youngs died in 1958 and by 1960 the petitioner had advanced $400,000 to the Estate of Merle L. Youngs. We do not consider this an acceptable ground for the accumulation of petitioner's earnings and profits in 1956. Petitioner loses sight of the requirement that the accumulation must be for the reasonable needs of its business, *30 and not to provide the estate of its majority stockholder with sufficient funds to meet the various estate duties and other expenses. Pelton Steel Casting Co. v. Commissioner, 251 F. 2d 278, affirming 28 T.C. 153. This is not a case where a corporation makes provisions to buy out a dissident stockholder, or arranges to redeem the stock from the estates of stockholders in the interest of corporate harmony. We need not discuss the cases involving such situations. Under its third category listed in the section 534 statement, petitioner lists a contingency reserve for litigation in the amount of $250,000. To support this item petitioner cites its litigation history and also states that in 1959 three lawsuits were pending against it. Reasonable needs of a business must be determined as they existed during the year 1956. Prior to 1956 the petitioner was involved in 11 legal actions, which are stipulated, ranging from 1930 to 1953. Five of these actions (from 1948 to 1952) involve patent infringement on the Killian patents. Since 1953 petitioner does not appear to have been involved in any litigation and nothing in the record even suggests that, as of 1956, litigation was at all in prospect. *31 It is significant, even if we take the 1959 litigation into consideration, that petitioner appeared in that action as amicus curiae, and that the fees and expenses in that action were about $7,000. It is clear that, as to this particular ground for accumulation, the statement does not state sufficient facts and is inadequate for the purpose of lifting the burden. Moreover, the record contains no evidence supporting this litigation reserve of $250,000 as a reasonable need of petitioner's business in 1956. We have rejected, up to this point, purported needs of petitioner's business as of 1956 amounting to over $1,600,000. It would serve no purpose to examine in detail the remaining grounds listed in petitioner's statement and on brief. Petitioner on brief lists its various "commitments" as of December 31, 1956 as amounting to $3,408,273.15. [2] Even assuming that the burden of proof on the remaining items had shifted to respondent, we are persuaded on the basis of this record that several of the remaining so-called "commitments" of petitioner cannot qualify as reasonable needs of its business. Moreover, we are far from convinced that the amounts which petitioner claims it requires for *32 its various "commitments" would bear close examination. Several of these amounts are sheer surmises, and while we should hesitate to substitute our opinion for that of the corporate officers, we are, nevertheless "not required to automatically accept the decisions of interested officers as the lodestone of reasonable needs." American Metal Products Corporation, supra; Trico Products Corp. v. Commissioner, 137 F. 2d 424, affirming 46 B.T.A. 346. *33 But even if we do accept the remaining "commitments" as valid reasonable needs, and in the amounts stated by petitioner, they do not total more than about $1,750,000. In deciding whether a corporation has accumulated earnings and profits for a particular year beyond the reasonable needs of its business, it is, of course, necessary to consider the accumulated earnings from prior years. Here the petitioner had accumulated a surplus of $2,900,584.41 [3] as of December 31, 1955. Its total current assets as of December 31, 1955 were $2,323,335.58 and its total current liabilities on that date were $349,145.60, a ratio of more than 6 to 1. We think it is evident, therefore, that all of the remaining "commitments" given by petitioner as reasons for its accumulation in 1956 could have been met by the accumulated surplus as of the beginning of that year. We hold that petitioner's earnings and profits in 1956 were permitted to accumulate beyond the reasonable needs of its business. As stated earlier, the issue here is whether petitioner was availed of in 1956 for the purpose of avoiding the income *34 tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being distributed. The fact that the earnings and profits are permitted to accumulate beyond the reasonable needs of the business is determinative of the proscribed purpose unless the corporation, by the preponderance of the evidence, shall prove to the contrary. Section 533(a). Petitioner has failed to meet its burden in this respect. Petitioner made a dividend distribution in 1946, then made no further dividend distributions until 1959, after the death of Merle L. Youngs, who, in 1956, owned 94.6 percent of petitioner's common stock. During the years 1947-1956, petitioner had a net profit in each of the years in excess of $100,000, and in three of the years in this period had a net profit in excess of $300,000. In 1956 petitioner's net profit after taxes and a minor adjustment was $76,218.16, and petitioner's failure to pay a dividend in 1956 resulted in a significant tax saving for Merle L. Youngs and his wife. If petitioner had distributed by dividend its earnings and profits in 1956 subject to distribution, Merle L. Youngs and his wife would have had an additional tax liability *35 of $64,340.86. There are other indications in the record which show that the personal needs of petitioner's controlling shareholder were met at least in part by the petitioner, but it will be unnecessary to go into these items. We hold, on the basis of the whole record, that petitioner was availed of in 1956 for the purpose of preventing the imposition of the income tax upon its shareholders. Decision will be entered for the respondent. Footnotes
*. These amounts are incorrectly computed in the stipulation.↩
*. Earned surplus includes reserve for expansion in the amount of $502,150, transferred from earned surplus in 1946.
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Petitioner lists its various "commitments" as of December 31, 1956 in its brief, as follows: ↩
Packaging materials ordered to be
paid during early months of 1957
$ 216,641.55
Research contract before 9/30/57
21,631.60
Contemplated 1957 loss in break-
ing into Canadian market
100,000.00
Immediate Investment in Drug Co.
#2 (Johnson-St. Petersburg)
125,000.00
Further advances to Holland-
Rantos
95,000.00
Warehouse at North Brunswick
(at least)
200,000.00
New home for Drug Co. #1 (John-
son-Tampa) in event of condem-
nation
$ 150,000.00
Second Deck for Building #11
at Trenton 1/2 costs
150,000.00
Additional losses in Canada
400,000.00
Capital for additional Wholesale
Drug house
400,000.00
Technological Progress
500,000.00
Litigation Reserve
250,000.00
Death of Merle L. Youngs
800,000.00
Total anticipated needs
$3,408,273.15
3. This total includes a reserve for expansion in the amount of $502,150 set up by petitioner in 1946.↩